**In re William Allen PARSLEY, Debtor.**

**No. 05–90374.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

March 5, 2008.

Christopher Todd Morrison, Attorney at Law, Beaumont, TX, for Debtor.

David Anthony Ortiz, Sean McClain Haynes, Stephen Douglas Statham, Steven Katzman, Richard Byrne, Houston, TX, for U.S. Trustee.

### MEMORANDUM OPINION ON SHOW CAUSE ORDERS OF FEBRUARY 12, 2007 AND MAY 18, 2007

JEFF BOHM, Bankruptcy Judge.

## I. Introduction

The matter before this Court began with a routine motion to lift stay, but has spiraled into a lengthy ordeal which has cost the parties substantial time, attorneys' fees, and costs. Over one year ago, on February 6, 2007, the Court sought a simple answer to a simple question—why was a motion to lift stay being withdrawn? The movant's attorney, rather than answer the question truthfully by admitting that the motion was based upon an incorrect payment history, attempted to conceal the truth from the Court—that the motion should have never been filed. This rather narrow issue precipitated an expansive proceeding. During several hearings over the past year, the Court received evidence on a wide range of misconduct beyond this initial misrepresentation.

The parties are a mortgage loan servicer and its two law firms: (1) Countrywide Home Loans, Inc. (Countrywide), the loan servicer for Fannie Mae, the mortgagee of the Debtor's home loan; (2) McCalla, Raymer, Patrick, Cobb, Nichols & Clark (McCalla Raymer), the national law firm to which Countrywide referred the file after deciding to seek relief from the automatic stay; and (3) Barrett, Burke, Wilson, Cas-

tle, Daffin & Frappier, L.L.P. (Barrett Burke), the Texas law firm which McCalla Raymer chose to draft, file, and prosecute the motion to lift stay. Their collective conduct caused this Court to issue two Show Cause Orders. This Memorandum Opinion discusses how their actions in the case at bar have shown a disregard for the professional and ethical obligations of the legal profession and judicial system.[1]

## II. Background of the events preceding the First Show Cause Order

### A. The importance of homesteads in Texas

■ In Texas, homesteads are sacrosanct. *In re McDaniel*, 70 F.3d 841, 843 (5th Cir.1995). Indeed, when it first took effect, the Texas State Constitution expressly forbade forced foreclosure sales on homesteads except for those creditors who held purchase money liens, mechanics' liens, or tax liens. *Magallanez v. Magallanez*, 911 S.W.2d 91, 94 (Tex.App.-El Paso 1995) (citing Tex. Const. art. XVI, § 50; Tex. Prop.Code Ann. § 41.002 (Vernon 2006)).[2] The public policy of Texas' liberal protection of homesteads is "to protect citizens and their families from the miseries and dangers of destitution." *In re Bradley*, 960 F.2d 502, 505 (5th Cir.1992) (quoting *Franklin v. Coffee*, 18 Tex. 413, 415–16 (1857)); *In re Sorrell*, 292 B.R. 276, 280 (Bankr.E.D.Tex.2002).

### B. The Court's concern over withdrawn motions to lift stay on homesteads of debtors

Given this important, long-standing policy protecting homesteads in Texas, this Court makes every effort to ensure that motions to lift stay seeking to foreclose on homesteads contain accurate information regarding payments made by the debtor. When a debtor's homestead is the subject of a withdrawn motion to lift stay, this Court typically inquires why the movant wants to withdraw the motion. In some cases, there is an entirely reasonable explanation. For example, if, between the date of the filing of the motion and the date of the hearing on the motion, the debtor has cured the defaults that were the basis of the motion, it makes sense for the movant to withdraw the motion. Conversely, the reason for withdrawal is suspect if, after the date of the filing of the motion, the movant discovers that the motion contains inaccurate factual allegations about the debtor's default. It is also reasonable to withdraw the motion under these circumstances, but it is neither fair nor equitable for the movant to charge the debtor for the attorney's fees and costs incurred in connection a motion that was deficient when filed.

Unfortunately, such fee and cost shifting sometimes occurs without the movant informing the Court or the debtor. *See Sanchez v. Ameriquest Mortgage Co. (In re Sanchez)*, 372 B.R. 289 (Bankr.S.D.Tex. 2007); Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, U. of Iowa Legal Studies Research Paper No. 07–29, Nov. 6, 2007, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1027961. The debtor only discovers the additional obligation months or years later

---

1. *See In re Maisel*, 378 B.R. 19, 20–21 (Bankr. D.Mass.2007) ("Unfortunately, concomitant with the increase in foreclosures is an increase in lenders who, in their rush to foreclose, haphazardly fail to comply with even the most basic legal requirements of the bankruptcy system.")

2. In 1997, the Texas Constitution was amended to allow for forced sales where the lien was created through a qualifying home equity loan. Tex. Const. art. XVI, § 50(a)(6)(A); *see also Box v. First State Bank*, 340 B.R. 782 784 (S.D.Tex.2006).

when, believing he has paid all of the monthly payments on the note, he learns that the debt is not entirely retired because these unfamiliar fees and costs, plus interest that has accrued thereon, remain unpaid. It is just such a scenario which this Court seeks to prevent by inquiring why a movant is withdrawing its motion to lift stay on a debtor's homestead.

If counsel for the movant concedes that the motion should not have been filed because it contained inaccurate allegations about payments and further represents that the movant will not shift the fees and costs to the debtor, this Court will typically sign the order allowing withdrawal of the motion and take no further action. However, if counsel for the movant does not concede that the motion contained inaccurate factual allegations, then this Court will inquire about the original basis for filing the motion to lift stay and why the movant is seeking to withdraw the motion.

## C. The January 23, 2007 preliminary hearing on Countrywide's motion to lift stay

In the case at bar, the Court was faced with a motion to lift stay which the Debtor claimed contained factually inaccurate allegations about his payment history. Countrywide, the servicer of the Debtor's mortgage, retained McCalla Raymer, whose offices are in Roswell, Georgia. McCalla Raymer then sent the Debtor's file to Barrett Burke's Houston office with a request that Barrett Burke file a motion to lift stay, which Barrett Burke did on December 29, 2006 (the Motion). [Docket No. 26.]

At the preliminary hearing on January 23, 2007, Warren Lee (Lee) appeared on behalf of the Debtor and announced that, based upon payment information provided by the Debtor on the previous day, the Debtor's counsel of record, Christopher Morrison (Morrison), had filed a response opposing the Motion (the Response). [Docket No. 27.] According to Lee, the Response was based on information which the Debtor himself had received from Countrywide the previous day. The Response states:

"The mortgage payment history, which is attached to the Movant's Motion for Relief, reflects that the Movant inaccurately applie[d] the first post-petition mortgage payment (received 11/09/2005) to the pre-petition arrears, rather than the November 2005 payment (see attached pay history). Furthermore, the attached mortgage payment history does not reflect the payment received by Movant on May 5, 2006 as shown on the Movant's own year-end 'transaction history for 2006.' "

One of Barrett Burke's attorneys, Yvonne Knesek (Knesek), also appeared at the preliminary hearing and informed this Court that she had just seen the Response a few minutes prior to the hearing. She stated that she would need to verify the payment history provided by the Debtor, but despite the misapplication of the Debtor's monthly payments, he was "still delinquent." [January 23, 2007 Hr'g Tr. 2:4–10.] Lee and Knesek represented that the parties wanted more time to ascertain the exact amount of the Debtor's arrearage; accordingly, they requested that the preliminary hearing be passed to a final hearing. The Court granted this request and set a final hearing for February 6, 2007.

## D. The February 6, 2007 final hearing

At the final hearing on February 6, 2007, a different Barrett Burke attorney, Walter Thurmond (Thurmond), appeared for Countrywide and announced that Countrywide wished to withdraw the Mo-

tion.[3] This Court, mindful that the Debtor's response set forth that the payment history was inaccurate, inquired whether the Motion contained allegations about the Debtor's payment history that were "just flat-out wrong." [Feb. 6, 2007 Hr'g Tr. 4:2–7.] Thurmond responded by saying that, "From what I have read in our system this morning and what I could tell from this, *the answer is it was a good motion.*" [Feb. 6, 2007 Hr'g Tr. 4:8–10 (emphasis added).] When this Court informed Thurmond that it had concerns that the Motion contained factual inaccuracies, Thurmond then represented to the Court that he would "check when I go back and see what the deal was with it." [Feb. 6, 2007 Hr'g Tr. 4:20–21.] Thurmond never informed the Court of the results of his research on the Motion. The Court was therefore left with two distinct impressions: (1) the Motion contained inaccurate allegations about the Debtor's payment history; and (2) Thurmond did not want to own up to these false allegations, and hoped that this Court would forget the whole matter.

### III. The First Show Cause Order

Based upon the suspect comments made by Thurmond, this Court issued a show cause order on February 12, 2007 requiring Countrywide and its counsel to appear and show cause why they should not be sanctioned for their conduct relating to the Motion (the First Show Cause Order). [Docket No. 29.] Specifically, the First Show Cause Order stated:

> This Court is concerned that Countrywide and/or its counsel have caused the Debtor to incur unnecessary legal fees and expenses by filing the [Motion] and

then withdrawing it at the eleventh hour because it contained factual inaccuracies that Countrywide and its counsel should have discovered prior to the filing of the Motion if proper attention [had] been given to the Debtor's mortgage payment history and appropriate procedures.

[Docket No. 29.]

The hearing on the First Show Cause Order was scheduled for March 5, 2007. The Court required a representative from Countrywide and three individuals from Barrett Burke to appear. At this point, the Court had not been made aware of the existence of McCalla Raymer and its role in this matter. As indicated by the language in the First Show Cause Order, the Court was focused on (1) whether misrepresentations were made to the Court that the Motion was factually accurate; and (2) ensuring that the Debtor was not being charged attorney's fees for a motion that should have never been filed. But for the extremely thorough investigation by the Office of the United States Trustee (UST), the Court may never have become aware of the numerous other issues discussed herein.

### A. The role of the United States Trustee in this matter

Prior to addressing the events of the March 5, 2007 hearing on the First Show Cause Order, the Court believes it is necessary to discuss the role of the UST—in this case, specifically, and in the bankruptcy system, generally—due to complaints by Barrett Burke, McCalla Raymer, and Countrywide that the UST was overstep-

---

3. At the final hearing, neither Morrison nor Lee appeared for the Debtor because, according to Thurmond, Morrison knew that Barrett Burke was going to inform the Court that Countrywide wished to withdraw the Motion. [Feb. 6, 2007 Hr'g Tr. 3:5–11.] Presumably, Morrison saw no need to attend this hearing because he knew there would be no testimony and therefore his services would not be needed.

ping its authority by being so actively involved in this matter.

When this Court issued the First Show Cause Order setting a hearing for March 5, 2007, the Court had no knowledge of the UST's intention to appear and be heard in this matter. The Court assumed that only Countrywide and Barrett Burke would appear at the hearing. Three days prior to the hearing, on its own volition, the UST filed a pleading entitled "Statement of the United States Trustee regarding this Court's Order requiring Countrywide Home Loans, Inc. [and Barrett Burke Wilson Castle Daffin & Frappier L.L.P. attorneys and personnel] to appear and show cause why [they] should not be sanctioned for filing a motion for relief from stay containing inaccurate debt figures and inaccurate allegations concerning payments received from the debtor." [Docket No. 40.] In this statement, the UST encouraged the Court to issue sanctions against Countrywide and Barrett Burke based on a bad faith failure to investigate the factual basis for the Motion. The UST further requested this Court to conduct an examination to determine whether Barrett Burke and/or Countrywide had engaged in similar past behavior. [*Id.*]

On the day of the March 5, 2007 hearing, Barrett Burke filed a Motion to Strike or, in the Alternative, Limit Issues and/or Continue Show Cause Hearing. [Docket No. 43.] In this motion, Barrett Burke asserted that the UST had no standing to participate in the show cause hearing. This Court disagreed and issued a ruling that the UST did have standing. [Docket No. 48.]

Notwithstanding this ruling, Barrett Burke, McCalla Raymer, and Countrywide, from time to time during the show cause hearings, questioned the UST's motives. Indeed, in closing arguments, Barrett Burke's counsel noted that in the case at bar, the Debtor himself had not lodged any complaint against Countrywide and its counsel—thereby insinuating that the UST had no business involving itself in the show cause hearing. [Dec. 12, 2007 Tr. 13:5–14:5 and 17:20–25.] The level of vituperation towards the UST merits some discussion of the UST's role in the bankruptcy system.

The UST frequently participates in matters such as objecting to fee applications, prosecuting motions to dismiss cases, prosecuting motions against bankruptcy petition preparers for violations of 11 U.S.C. § 110, objecting to disclosure statements and plans in Chapter 11 cases when these pleadings are legally deficient, and prosecuting objections to discharge in Chapter 7 cases. Although it is uncommon, and possibly unprecedented until recently, for the UST to focus on the conduct of a mortgagee, a servicer, or its counsel in a Chapter 13 case, it does not follow that the UST is outside of its Congressional mandate as suggested by Barrett Burke, McCalla Raymer, and Countrywide.

 Statutory law, case law, and legislative history indicate the UST has an extremely broad role in the bankruptcy process. 11 U.S.C. § 307 states that: "The United States trustee *may raise and may appear and be heard on any issue in any case* or proceeding under this title but may not file a plan pursuant to section 1121(c) of this title." (emphasis added). The language in this statute is unambiguous: the UST, on its own, has the right to raise and be heard on any issue of its choosing. *See, e.g., In re Revco D.S., Inc.,* 898 F.2d 498, 499 (6th Cir.1990) (reversing district court's holding that the UST lacked standing because it had no pecuniary interest at stake, the Sixth Circuit held that the UST had standing to appeal because its role is "protecting the public interest and ensuring that bankruptcy

cases are conducted according to law."); *In re Clark*, 927 F.2d 793, 794 (4th Cir. 1991) (holding that the UST has standing to appeal based on Revco's reasoning that the UST's duty is to ensure that bankruptcy cases are conducted according to law); *In re Dow Corning Corp.*, 194 B.R. 147 (Bankr.E.D.Mich.1996) ("One of the United States trustee's principal raisons d'etre is to guard and protect the bankruptcy system ... The United States trustee now monitors such activities and objects *not because parties in interest may be harmed by the action, but merely to protect the integrity of the system.*") (emphasis added).

Congressional history supports wide-ranging authority for the UST. In discussing the role and duties of the UST, the legislative history of the Bankruptcy Reform Act of 1978 stated that:

> They [i.e., the UST] will serve as enforcers of the bankruptcy laws by bringing proceedings in the bankruptcy courts in particular cases in which a particular action taken or proposed to be taken deviates from the standards established by the proposed bankruptcy code ... The United States Trustee will conduct investigations in appropriate circumstances to ensure that participants in bankruptcy cases are not avoiding the requirements of the bankruptcy code. H.Rep. No. 595, 95th Cong., 1st Sess. 109–10 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6070.

█ In the case at bar, the UST read this Court's First Show Cause Order and decided to appear and be heard on the issues raised therein. In so doing, the

UST was well within its authority to investigate the activities of Countrywide, Barrett Burke, and McCalla Raymer to determine if their activities undermined the integrity of the bankruptcy system. The Court would also note that the discovery conducted by the UST, and its examination of witnesses at the show cause hearings, has been very thorough and skillful.

In sum, merely because the UST has not previously focused on the practices of mortgagees in consumer bankruptcy cases does not mean that the UST is prohibited from doing so now. 11 U.S.C. § 307 grants the UST extremely broad standing. The Court greatly respects the UST's work in this case and anticipates that the UST will participate in future hearings in this Court.

## B. The March 5, 2007 hearing on the First Show Cause Order

Three witnesses testified at the March 5, 2007 hearing on the First Show Cause Order: (1) Felicia Sanov (Sanov), the associate attorney at Barrett Burke who signed the Motion; (2) Lois Ortiz (Ortiz), the manager of the bankruptcy department at Countrywide; and (3) John Schlotter (Schlotter), an associate attorney at McCalla Raymer who had knowledge about the Debtor's file.[4]

### 1. Felicia Sanov's testimony

Sanov worked as an attorney at Barrett Burke for over four years and has been licensed to practice law in Texas since 1987.[5] [March 5, 2007 Hr'g Tr. 18:6–21.]

---

4. The Court heard testimony from many witnesses during the numerous hearings on the Second Show Cause Order. In order to assist the reader with following the names of the witnesses referenced in this Memorandum Opinion, the Court has attached an adden-

dum which identifies the witnesses who testified in the case at bar.

5. On March 5, 2007, Sanov was still employed at Barrett Burke. However, at the hearing on August 10, 2007, Sanov testified

Sanov stated that McCalla Raymer had been referring files to Barrett Burke for approximately 15 years and that the volume ranged from 100–150 files per month; indeed, she testified unequivocally that McCalla Raymer is "a major client of the firm." [March 5, 2007 Hr'g Tr. 20:15–24; 21:5–6.] She also stated that McCalla Raymer referred the Debtor's file to Barrett Burke on December 11, 2006 for the purpose of filing a motion to lift stay. [March 5, 2007 Hr'g Tr. 20:2–8; 21:21–25.]

On December 29, 2006, Sanov signed the Motion, attached the Debtor's loan history, and filed this pleading with the Clerk's office. The Motion alleged that the Debtor had: (1) estimated equity in his homestead of $8,653.21; (2) total post-petition arrearages of $2,255.07; and (3) total arrearages (both and pre- and post-petition) of $6,969.92. [Docket No. 26.]

Sanov testified that prior to the preliminary hearing scheduled for January 23, 2007, counsel of record for the Debtor, Chris Morrison (Morrison), left a message for Sanov's colleague at Barrett Burke, Chris Reilly (Reilly), to the effect that the Debtor had in fact made the November 2005 payment which Barrett Burke alleged was part of the post-petition defaults. [March 5, 2007 Hr'g Tr. 31:7–16.] Sanov admitted that this payment was in fact made by the Debtor but mistakenly applied as a pre-petition rather than a post-petition payment. [March 5, 2007 Hr'g Tr. 36:22–37:25.] Sanov also testified that contrary to the loan repayment history, the Debtor did in fact make a full payment in May 2006. She conceded that she had made a mistake in reviewing the loan history prior to filing the Motion. [March 5, 2007 Hr'g Tr. 38:1–14.]

Finally, Sanov testified that whenever McCalla Raymer referred a Countrywide file to Barrett Burke, the attorneys at Barrett Burke never dealt directly with Countrywide and, indeed, had no ability to contact Countrywide directly with regard to the accuracy of a loan history. Rather, Barrett Burke dealt solely with McCalla Raymer. [March 5, 2007 Hr'g Tr. 23:11–18.] The Court was concerned that a law firm would contractually obligate itself to be precluded from any and all communication with its actual client.[6] This issue is one of the new issues which this Court raised in the Second Show Cause Order.

### 2. Lois Ortiz's testimony

Ortiz has been the manager of Countrywide's bankruptcy department for over two and a half years and has over twenty years of experience in the mortgage lending industry. [March 5, 2007 Hr'g Tr. 51:18–52:5.] Ortiz testified that no Countrywide employee reviews pleadings before they are filed; rather, Countrywide relies entirely on its attorneys to ensure that the pleadings being filed on its behalf are accurate based upon information provided by Countrywide. [March 5, 2007 Hr'g Tr. 69:9–70:13.] Additionally, she stated that no one at Countrywide reviewed the loan history attached to the Motion prior to its filing. [March 5, 2007 Hr'g Tr. 68:12–24.]

Ortiz also conceded that Countrywide did not give credit to the Debtor for the

that Barrett Burke had fired her on March 20, 2007 due to her conduct in *In re Allen,* 2007 WL 1747018, 2007 Bankr.LEXIS 2063 (Bankr.S.D. Tex. June 18, 2007). [Aug. 10, 2007 Hr'g Tr. (afternoon session) 116:13–22.]

**6.** The written agreement that McCalla Raymer has with its local counsel throughout the country, including Barrett Burke, states that: "All communications must be made through your McCalla contact at our office. We require responses to your inquiries within 24 hours and will hold your office to the same standard." [Barrett Burke Exhibit No 4A.]

post-petition payment that he made on November 9, 2005 because Countrywide believed the filing date was November 15, 2005—in Ortiz's own words, "We did not know about the bankruptcy until November 15th. And during that process, it was not acknowledged that the November payment was received as a post-petition payment." [March 5, 2007 Tr. 58:9–12.] She also conceded that the payment history attached to the Motion failed to reflect that the Debtor made a complete monthly payment on May 5, 2006. [March 5, 2007 Hr'g Tr. 71:9–19.]

Finally, Ortiz testified that Countrywide's policy is that if it withdraws a pleading, Countrywide does not assess to the borrower any attorney's fees incurred by Countrywide in the drafting and prosecution of the pleading prior to its withdrawal. [March 5, 2007 Hr'g Tr. 71:20–72:20.] Despite Ortiz's testimony on this issue, the Court was concerned that Countrywide did not have an actual written policy against charging debtors for withdrawn motions. This is another issue which the Court raised in the Second Show Cause Order.

### 3. John Schlotter's testimony

Schlotter has been an associate attorney at McCalla Raymer for 10 years and has been licensed to practice law for 28 years. [March 5, 2007 Hr'g Tr. 75:24–76:10.] He testified that one of his duties is to ensure that referrals such as the one in the case at bar are sent to the appropriate local counsel in the state where the bankruptcy is filed. [March 5, 2007 Hr'g Tr. 76:11–21.] The Court was surprised by Schlotter's testimony that he was the attorney-in-charge of the Debtor's file. [March 5, 2007 Hr'g Tr. 90:25–91:6.] Although he testified that he was the attorney-in-charge, Schlotter also testified that he had not filed a notice of appearance, had never read the Local Rules for the Southern District of Texas, and had not reviewed the Motion before it was filed. [March 5, 2007 Hr'g Tr. 91:7–92:14; 95:4–22.] The Court was further surprised by Schlotter's testimony that Barrett Burke's client in the case at bar was McCalla Raymer, not Countrywide, and that McCalla Raymer directs Barrett Burke on how any file, including the file in the case at bar, is to be handled. [March 5, 2007 Hr'g Tr. 78:6–14; 93:8–94:6.]

With respect to the payment history attached to the Motion, Schlotter testified that his firm's paralegal staff prepared this history "[a]nd the reason they're prepared this way is because we've had different courts require legible payment histories. And when we submitted screens, we've got courts that have rejected them. And other courts have said, 'We can't read these. We want something that's legible, that shows exactly how the payments are applied, that somebody who doesn't have an accounting background can read it.'" [March 5, 2007 Hr'g Tr. 80:25–81:7.] Schlotter testified that no attorney at McCalla Raymer reviews the loan histories prepared by the paralegals. [March 5, 2007 Hr'g Tr. 96:1–97:5.]

Schlotter also testified that he became aware of the errors in the Debtor's payment history when he received a call from Thurmond, who told him that the Debtor had filed a response opposing the Motion and that there were some discrepancies in the payment history. [March 5, 2007 Hr'g Tr. 90:15–19.] Based upon this information from Thurmond, Schlotter personally authorized Thurmond to withdraw the Motion. [March 5, 2007 Hr'g Tr. 88:19–21.]

Finally, Schlotter testified—just as Sanov had—that any communications from Barrett Burke must be directed to McCalla Raymer, not Countrywide. [March 5, 2007 Hr'g Tr. 79:11 –20; 99:18–100:6.] In-

deed, he stated that if Barrett Burke were to contact Countrywide directly without going through McCalla Raymer, it would be a problem: "It can be [a problem]. It usually is ... Because, pursuant to agreement with local counsel, the reason that Countrywide would hire us is because it wants to deal with one firm. It doesn't want to have 50 firms calling it on every case that it handles in the country. So it asks that all communication goes through our office." [March 5, 2007 Tr. 94:21–95:3.] The Court was concerned that Countrywide has insufficient lines of communication with those attorneys throughout the country who are representing Countrywide in the courtroom.

### C. The Court's concerns arising from the March 5, 2007 hearing

Based upon the testimony of these three witnesses, the Court had further concerns about the activities of Barrett Burke, McCalla Raymer, and Countrywide in connection with the filing of the Motion. Two of these concerns have already been discussed above: (1) Barrett Burke's contractual obligation to refrain from any and all communication with Countrywide; and (2) Countrywide's lack of a written policy against charging debtors for withdrawn motions. Third, the Court was concerned as to why Schlotter testified that he was the attorney-in-charge when Sanov signed the Motion and Schlotter did not file a notice of appearance or review the Motion prior to its filing.[7] Fourth, Sanov and Schlotter both testified that McCalla Raymer was the client of Barrett Burke; yet, the Motion represented that Barrett Burke was the attorney for Countrywide, not McCalla Raymer. Finally, Sanov, Ortiz, and Schlotter all testified that the loan

payment history contained several inaccuracies, and Schlotter testified that it was Thurmond who informed him of these errors. Yet, when this Court had asked Thurmond on February 6, 2007 if the Motion contained inaccurate allegations, he represented to this Court that "from what I read in our system this morning, and from what I could tell from this, the answer is it was a good motion." [Feb. 6, 2007 Tr. 5:8–10.] Accordingly, this Court decided to issue the Second Show Cause Order to obtain clarification of these various issues.

### IV. The Second Show Cause Order

After reviewing the transcript of the March 5, 2007 hearing, the Court issued a second show cause order (the Second Show Cause Order). [Docket No. 57.] The Second Show Cause Order set forth that the Court was concerned about the following issues: (1) why Thurmond expressly represented to this Court that the Motion was "good" when Sanov, Ortiz, and Schlotter all testified that the pay history attached to the Motion failed to account for the Debtor's November 9, 2005 and May 6, 2006 payments, and when Schlotter himself testified that he learned about these errors from Thurmond; (2) the language in paragraph 16 of McCalla Raymer's referral guidelines prohibiting Barrett Burke—or any firm retained by McCalla Raymer—from communicating directly with Countrywide; (3) Schlotter's confusing testimony that Barrett Burke's client was McCalla Raymer, not Countrywide, and that he was the attorney-in-charge despite neither signing the Motion nor filing a notice of appearance; and (4) whether Countrywide really did have a written

---

7. Local Rule 11.1 of the United States District Court of the Southern District of Texas states: "On first appearance through counsel, each party shall designate an attorney-in-charge.

Signing the pleading effects designation." The District Local Rules are made applicable to all bankruptcy court proceedings by Bankruptcy Local Rule 1001(b).

policy not to assess a borrower any attorney's fees incurred in the drafting and filing of a motion to lift stay when that motion is later withdrawn due to inaccurate allegations. [*Id.*]

Based upon a motion of the UST, the Court continued the scheduled June 26, 2007 hearing until July 27, 2007. [Docket No. 105.] The number of witnesses and scope of examination in connection with the Second Show Cause Order far exceeded the Court's original expectation. In addition to the July 27, 2007 hearing, the Court held four more days of hearings in August on the Show Cause Orders.[8] There were too many witnesses and too much testimony to address the hearings chronologically in this Memorandum Opinion. Instead, the balance of this Memorandum Opinion is organized by issue: first, the specific issues raised in the Second Show Cause Order; and second, the miscellaneous issues that came to light during the hearings within the context of the parties' general conduct related to the Motion as raised in the First Show Cause Order.

### A. Why did Thurmond represent to the Court that the Motion was a "good motion?"

On direct examination by Barrett Burke's attorney, Thurmond conceded that when he went to the courthouse on February 6, 2007, he knew that the payment history attached to the Motion was incorrect with respect to the November 9, 2005 and May 6, 2006 payments.[9] [July 27,

2007 Tr. 350:15–19.] Thurmond was asked why, when this Court asked him at the February 6, 2007 hearing whether there were any allegations in the Motion that were factually inaccurate, he represented that the Motion was a "good motion." Thurmond responded:

"In the context of all the work that I have ever done going back to 1984 . . . if there's a default and there's minimal equity, that's grounds for a motion for relief.

In this case, I looked in the system notes that were part of the database and saw that the payoff was in excess of $59,000. If you use the value that the Debtor had put on his schedules, the $65,000, and you look to the net realizable net equity after taking out hypothetical closing costs, they probably had no equity. If you looked at the Harris County website appraisal, I think it was only, like, $48,000 or $49,000 so that if I was going to try that one, I would want to try to reconcile the two valuations. If you went with the Harris County Appraisal District value and they were clearly in a position of no equity, they were, I believe, undisputedly behind by a month and then on February 6th, they're behind two more months. And probably every place that I've ever worked, that would be a good motion. It would have been one that I felt like I could prosecute and win . . .

My frame of reference when I was looking through all this information was

---

8. The Court also held a hearing on October 29, 2007 and heard closing arguments on December 12, 2007.

9. On cross-examination, Thurmond stated that he was unaware that the payment made on December 13, 2006 was not reflected in the payment history attached to the Motion. [July 27, 2007 Tr. 365:3–8.] The Court is skeptical of this testimony in view of the fact

that Thurmond had an attorney worksheet with him when he appeared at the February 6, 2007 hearing. This worksheet expressly stated that the Motion needed to be withdrawn because the Debtor had, in fact, made payments on November 9, 2005, May 5, 2006, and December 13, 2006. [Barrett Burke Exhibit No. 31.]

whether or not it complied with Rule 11—or 9011. Was it based on facts that supported the argument that was being presented in the Motion? It was a valid, prosecutable motion ..."

[July 27, 2007 Tr. 353:1–21, 353:25–354:4.]

Thurmond's answer is disingenuous. This Court did not ask Thurmond whether the Motion was a "valid, prosecutable motion." Rather, this Court expressly asked him the following question: "Okay. I guess what I'd like to know Mr. Thurmond, is when the motion was filed, are the allegations in the motion just flat-out wrong?" [Feb. 6, 2007 Hr'g Tr. 4:2–7.] Thurmond's answer on February 6, 2007 that it was "a good motion," and his subsequent explanation of that answer at the July 27, 2007 hearing, artfully dodges the subject of the Court's inquiry—whether the Motion contained factual inaccuracies. Thurmond knew full well that the payment history attached to the Motion did not account for the November 9, 2005 payment or the May 6, 2006 payment, and that therefore the allegations in the Motion concerning the defaults and post-petition arrearage were, in fact, "flat-out wrong." Indeed, under cross examination by the UST, Thurmond conceded that he knew about the errors in the Debtor's payment history when he came to court on February 6, 2007. [Aug. 10, 2007 Hr'g Tr. (afternoon session) 46:11–47:9.]

Moreover, this Court has no doubt that Thurmond knew about these problems with the payment history because Schlotter convincingly testified that "I got involved in this case either a day or two before the final hearing on the motion for relief in February of 2007, when I got a call from Walter Thurmond at Barrett Burke telling me that there were some discrepancies with the payment history, and it didn't appear that the debtor was now more than 60 days delinquent in his recommendation. And he asked for my consultation on it and an agreement that we would withdraw that motion." [10] [Aug. 8, 2007 Hr'g Tr. 13:16–23.] Indeed, Schlotter had a distinct and credible recollection of a conversation with Thurmond the day *before* the February 6, 2007 hearing:

The Court: All right. Let's go through that. Did you call Mr. Thurmond or did Mr. Thurmond call you?

Schlotter: He called me.

The Court: All right. Morning or afternoon, if you remember?

Schlotter: I'm trying to remember, but I think—I don't know for sure, but it seems like it was sometime close to lunch.

The Court: And do you recollect what Mr. Thurmond told you? Tell me everything he told you.

Schlotter: He said, 'John, I think this one, there's a problem with the loan history, and the debtor is saying that they made more payments, and I got a history from the client showing that there were payments that weren't reflected, and if he's correct, then the loan isn't as far delinquent as we said in the motion. So, you know, it's a Fannie Mae loan, but it's not 60 days delinquent. Assuming the debtor is correct in his assertions, I think we should withdraw this, and I'd like to do that.'

---

**10.** Schlotter's testimony that the Debtor was not more than 60 days delinquent refers to a Fannie Mae guideline setting forth that no motion to lift stay should be filed unless the debtor is at least 60 days delinquent (i.e. has failed to make two monthly payments). *See* Sec. IV.E.5 *infra*.

The Court: Okay. And what did you say?

Schlotter: I said, you know, I talked to him. I asked him what were the problems on the history, and he told me basically that there was misapplied pre- or post-petition payment, and that there was an annual statement that went out to the debtor that showed receipt of a payment. No, that was after the fact. There was one, I think a May payment or something had not been applied properly, so that would have been two payments, which meant that at that point, then, the debtor was probably only one month behind. And I agreed with him that it was a good idea we should withdraw it instead of pursuing it.

The Court: So, are you telling me that Mr. Thurmond was knowledgeable about payment problems?

Schlotter: When he spoke to me, he was, yes.

[Aug. 8, 2007 Hr'g Tr. 70:2–71:11] [11]

Thurmond also acknowledged that he had the attorney worksheet for the Debtor's file in his possession when he came to court on February 6, 2007, and that he read this attorney worksheet prior to attending that hearing. [12] [Aug. 10, 2007 Hr'g Tr. (afternoon session) 31:3–7; 46:1–4.] The attorney worksheet contained the following paragraph:

Please submit the [agreed order withdrawing the Motion]. This is the second hearing on this matter and a response has been filed in opposition. We had a signed [agreed order] on this file and then right before the first hearing the [Debtor's attorney] provided proofs of payments and informed us that the first payment the debtor made post petition was applied as a pre petition payment. This payment was applied on 11/09/2005 in the amount of $684.62 and has now been reversed from pre petition and reapplied to the 11/01/2005 post petition payment. Also the debtor provided a copy of a transactional history that they received from Countrywide which showed that they made a payment [in the amount of] $751.69 on 5/5/2006 that was not listed on Countrywide post petition history as well as a payment [in the amount of] $751.69 on 12/13/2006. These payments have now been applied correctly and we have found that the loan was post petition due for 12/01/2006 with money in suspense when we filed the [Motion] on 12/29/2006 and this is why we are withdrawing [the Motion]. The loan is still past due for 12/01/2006. Yvonne Knesek and Chris Reilly approved the withdraw and the [Debtor's attorney] is aware we are withdrawing. [Barrett Burke Exhibit No. 31.]

Because Thurmond admitted reviewing these notes prior to the February 6, 2007 hearing, he knew that the Motion contained allegations that were factually inaccurate and that, therefore, the Motion needed to be withdrawn. [13]

---

11. Schlotter's recollection of his telephone conversation with Thurmond was vivid and very credible even though, as is subsequently discussed herein, Schlotter's testimony on a variety of other issues was muddled and, in some instances, simply incorrect.

12. The attorney worksheet is a document internally generated within Barrett Burke. This document contains a summary of information relevant to a certain hearing, including basic information such as the time, location, and name of opposing counsel as well as instructions for the attorney making the appearance. The entire instruction portion of the attorney worksheet is comprised of the above-quoted paragraph. [Barrett Burke Exhibit No. 31]

13. It is also worth noting that the Debtor was not in sufficient default for the Motion to have been filed under the Fannie Mae guideline

Aside from the attorney worksheet, Barrett Burke also created a document known as the "Bankruptcy Case Comments." [Barrett Burke Exhibit No. 3.] This document contained several comments indicating that the Debtor had provided proof of payments that the Motion alleged had not been made. Most important of these comments was the one made on February 5, 2007 (i.e., the day before the final hearing) by a legal assistant named Sabrina LaPell, the same legal assistant who prepared the attorney worksheet: "[talked to] Chris R. [i.e., Chris Reilly] and YK [i.e. Yvonne Knesek], per YK we need to get approval to [withdraw] this MFR b/c after confirming a [payment] was [received] on 12/13 this would mean that the loan was post [sic] due for 12/1/06 when we filed the MFR on 12/29." [Barrett Burke Exhibit No. 3, pg. 2.] These comments leave no doubt that Knesek knew of the errors in the Motion. Therefore, Thurmond, who testified that he spoke with Knesek prior to going to court on February 6, 2007 [Aug. 10, 2007 Hr'g Tr. (afternoon session) 34:2–35:13], had to have known that the Motion contained inaccurate factual allegations.

As a final note on the issue of Thurmond's misrepresentation that "it was a good motion," the Court asked several witnesses what would have been their response had they been standing in Thurmond's place at the February 6, 2007 hearing when the Court inquired about the factual inaccuracies in the Motion. Although hindsight is 20/20, their answers are telling.

Mary Daffin, the Barrett Burke partner in charge of the bankruptcy department, responded to this hypothetical as follows: "If you had asked me if it contained inaccurate factual allegations, I would have told you, yes, sir, it does contain inaccurate factual allegations." [July 27, 2007 Hr'g Tr. 336:15–17.]

The following exchange between this Court and Sanov occurred at the July 27, 2007 hearing:

The Court: Let's assume you had come [to the February 6, 2007 hearing].

Sanov: Okay.

The Court: And you had gone up to the podium and said [just like Thurmond did] "Judge, we want to withdraw the Motion." And let's assume I said to you, "why?" What would you have said?

Sanov: I would have said that a mistake was made on the pay history and that the loan was not sufficiently delinquent when the Motion was filed.

The Court: And if I had said to you, "You mean you're telling me that the Motion to Lift Stay contains factual allegations that are not true," what would your answer have been?

Sanov: I would have said that I now know that they are not true.

[July 27, 2007 Hr'g Tr. 221:21–222:10.]

Finally, the following exchange between this Court and Schlotter occurred at the August 8, 2007 hearing:

The Court: If I had said,' Are there allegations in the motion that are incorrect?', what would you have said to me?

which requires two missed monthly payments before filing a motion to lift the stay. [Aug. 10, 2007 Hr'g Tr. (afternoon session) 21:14–22:19.] Thurmond was well aware of this Fannie Mae guideline at the time he represented to this Court the Motion was a "good motion." Moreover, John Smith, the Countrywide representative, testified that if he had been asked whether he would authorize the filing of the Motion, he would have said, "without question, don't file it ... because it did [not] meet the guidelines that we have set forth to file a Motion for Relief in that instance." [Aug. 9, 2007 Hr'g Tr. 260:20–24.]

Schlotter: I would have said, 'It appears that there are, yes.'

[Aug. 8, 2007 Hr'g Tr. 72:25–73:4.]

In addition to the "good motion" misrepresentation, the Court had a second concern about Thurmond's other statements at the February 6, 2007 hearing. After Thurmond told this Court that the Motion was a "good motion," the undersigned judge stated that "what I'm going to do is take a look at the motion myself." [Feb. 6, 2007 Hr'g Tr. 4:14–15.] Thurmond then replied that he would "check when I go back and see what the deal was with it." [Feb. 6, 2007 Hr'g Tr. 4:20–21.] This statement led the Court to believe that Thurmond would return to his office, check with his colleagues to determine whether the Motion contained inaccurate factual allegations, and, if he was incorrect, file a notice with the Court correcting his prior misstatement that the Motion was a "good motion."

Thurmond never reported back to the Court. Indeed, his silence was deafening. At the July 27, 2007 hearing, Thurmond could offer no explanation as to why he did not report back to the Court:

The Court: Did you check?

Thurmond: Yes, I did.

The Court: Did you get back with the Court?

Thurmond: I did not.

[July 27, 2007 Tr. 374:10–13; *see also* Aug. 10, 2007 Hr'g Tr. (afternoon session) 62:4–23.]

Thurmond's concession that he did not report back to the Court underscores his

less than commendable view regarding the professional duty that an attorney has to be candid with the Court.[14]

**B. The policy prohibiting Barrett Burke from communicating directly with Countrywide**

Sanov and Schlotter both testified at the March 5, 2007 hearing that Barrett Burke attorneys were not allowed to contact Countrywide, and that all communications must be filtered through McCalla Raymer. The Court was troubled by such an arrangement because it precluded the attorney filing the motion from speaking with the actual client. This issue was included in the Second Show Cause Order and addressed by several witnesses during the later hearings.

Sanov returned to court for a second round of testimony on July 27, 2007. She reiterated her previous testimony that all Barrett Burke communications went through McCalla Raymer. [July 27, 2007 Hr'g Tr. 204:5–15.] She further acknowledged that Barrett Burke had to ask permission from McCalla Raymer to withdraw any pleadings. [July 27, 2007 Hr'g Tr. 191:18–24.]

Reilly also testified on July 27, 2007 about the "no communication clause." Reilly was an attorney at Barrett Burke who handled files involving Fannie Mae loans, including files where McCalla Raymer was national counsel and retained Barrett Burke as local counsel. He was steadfast in his testimony that he was not permitted to communicate directly with

---

14. In contrast to Thurmond's nonchalant attitude towards his obligation to correct false statements he made to the Court, Barrett Burke's outside counsel for the show cause hearings, William Greendyke, exhibited the appropriate behavior in such circumstances. Greendyke made an argument in closing based on statements that were objected to and excluded at a previous hearing. During a break in the closing arguments, Greendyke reviewed the record, realized his mistake, and informed the Court of his error. [Dec. 12, 2007 Hr'g Tr. 137:12–22.] Barrett Burke should train its own associates to conduct themselves in the same manner as their outside counsel.

Fannie Mae and that he could only communicate with McCalla Raymer. [July 27, 2007 Tr. 47:18–48:14.] He also testified that McCalla Raymer had to give its approval before he could withdraw a motion or enter into an agreed order.[15] [July 27, 2007 Tr. 48:25–49:8; *see also* 104:15–19.]

Regina Thomas (Thomas) is the managing attorney for McCalla Raymer's bankruptcy department. Thomas confirmed McCalla Raymer's policy prohibiting local counsel such as Barrett Burke from communicating directly with Countrywide and testified that the purpose of the policy is to ensure that McCalla Raymer keeps apprised of the status of any matter in litigation for which McCalla Raymer is national counsel. [Aug. 7, 2007 Hr'g Tr. 37:15–25.] She further testified that Countrywide has never complained to McCalla Raymer about this restriction. [Aug. 7, 2007 Hr'g Tr. 38:11–13.] According to Thomas, Countrywide desires this restriction because it does not want the various local firms throughout the country contacting Countrywide for information. [Aug. 7, 2007 Hr'g Tr. 38:14–39:1.] Thomas also testified that, pursuant to McCalla Raymer's terms of engagement with Countrywide, McCalla Raymer is not required to monitor post-petition payments made by debtors. [Aug. 7, 2007 Hr'g Tr. 21:11–19.]

Given that Barrett Burke must communicate only with McCalla Raymer, and that McCalla Raymer is not required to monitor post-petition payments made by debtors, this Court is at a loss to understand how Barrett Burke can possibly comply with Bankruptcy Rule 9011 before filing a motion to lift stay. This arrangement truly creates a situation where the blind (McCalla Raymer) is leading the blind (Barrett Burke).

In the wake of this Court's Show Cause Orders, McCalla Raymer changed the language of its engagement letters with local counsel so that they now do not expressly prohibit direct communication with the client. Thomas testified that communication through McCalla Raymer is now just the "preferred method of communication . . . because again, the foundation of this is that we're representing the client in the context of the entire case, versus a specific litigated matter. But its [sic] basically a language change reflects [sic] that in the event that counsel needs to contact the client, they are permitted to do so. And then we ask them to notify us what that communication was, so that we can maintain our records for all communication." [Aug. 7, 2007 Hr'g Tr. 40:8–16; *see also* 75:14–76:1.] The Court recognizes that this is an improvement upon the previous outright ban on communication with the client. However, the Court remains concerned that local counsel will still be hesitant to directly contact the client out of the fear that McCalla Raymer will cease sending files to that local counsel.

### C. Who was Barrett Burke's client and who was the attorney-in-charge?

#### 1. Who was Barrett Burke's client?

At the March 5, 2007 hearing, Schlotter testified that Barrett Burke's client was McCalla Raymer, as opposed to Countrywide. [March 5, 2007 Hr'g Tr. 78:6–14.] However, Schlotter recanted that testimony at the August 8, 2007 hearing:

> UST: Mr. Schlotter, [Countrywide's counsel] asked you [at the March 5, 2007 hearing], 'Who is the client for

---

**15.** This testimony tracks with Schlotter's testimony insofar as Schlotter testified that he personally authorized Thurmond to withdraw

the Motion. [March 5, 2007 Hr'g Tr. 88:19–21.]

Barrett Burke?' on page 78, line 8. Let me know when you get there.

(Witness complies)

UST: She asked you, 'Who is the client for Barrett Burke?' And your answer was, 'Well, we would be the client.' That was your testimony?

Schlotter: Yes.

UST: Did you feel rushed in giving that answer?

Schlotter: Yes.

UST: You did?

Schlotter: Yes.

UST: Why?

Schlotter: Because I hadn't had time to think it through; because I knew what was going on. I knew that we had sent the referral for Countrywide, but, as I said, and I'll say it again, our office retained Barrett Burke. Countrywide did not retain Barrett Burke. Our office retained Barrett Burke on behalf of Countrywide, and we were the contact with Barrett Burke. We would pay them for their services. So, in my mind, they represented Countrywide to file the motion. That's what we asked them to do. But Countrywide did not hire them; McCalla Raymer did.

UST: Well, sir, when the Court then followed up on that particular answer, and I'll direct your attention to page 93 of your testimony that day. Let me know when you get there.

(Witness complies)

. . .

UST: Okay. The Court followed up at line 8 on page 93; T thought I heard you testify when Ms. Madan [Countrywide's counsel] was asking you questions, that you said your firm was the client of Barrett Burke. Is that correct?' Answer:' That's correct.' Did you not have enough time the

second time you were asked that question?

Schlotter: Apparently not, because my mind was still based on the same thoughts that our office hired Barrett Burke, and we paid Barrett Burke.

UST: Well, the Court then followed up again. The third time you've been asked this question, at line 13: 'And that's your understanding?' Answer: 'That's my understanding.' Three times you were asked the question, 'Who was the client,' and three times you said, 'McCalla Raymer.' Is that correct?

Schlotter: That's correct. And if you'll go on, and the Court asks more questions about that, and I think that's where I confused it more.

UST: So, it was only because of the Court's persistence that you answered—you kept answering differently instead of telling the truth the first time? Is that what you're saying?

(Witness reviews the transcript)

Schlotter: Well, that's what I said.

UST: How many times do you have to be asked the same question to give you enough time to tell the truth?

Schlotter: That's a question I can't answer. I guess it depends on what I understand of the question. I certainly didn't intend to mislead the Court, and I don't at this point intend to mislead the Court, but I certainly want to clarify what happened.

[March 5, 2007 Hr'g Tr. 43:2–45:14.]

After all was said and done, this Court has no doubt now that everyone understands that Barrett Burke's client is Countrywide. It is disconcerting that Schlotter, an attorney with 28 years of experience, would think otherwise. His initial testimo-

ny underscores the need for McCalla Raymer to properly train its attorneys.

### 2. Who was the attorney-in-charge?

District Court Local Rule 11.1 of the Southern District of Texas requires each party to designate an attorney-in-charge, and signing the first pleading for that party is effective designation. Local Rule 11.2 states: "The attorney-in-charge is responsible in that action for the party. That individual attorney shall attend all court proceedings or send a fully informed attorney with authority to bind the client."

On July 27, 2007, Sanov testified that she was definitively the attorney-in-charge of the Debtor's file under Local Rule 11.2. [July 27, 2007 Hr'g Tr. 201:2–11.] This testimony directly contradicts Schlotter's testimony at the March 5, 2007 hearing that he was the attorney-in-charge of the Parsley file. [March 5, 2007 Hr'g Tr. 90:25–91:3.] However, when Schlotter took the stand again on August 8, 2007, he recanted this testimony:

MR's Attorney: At the time you answered [the UST's] questions [on March 5, 2007] and the Court's follow up question, were you aware that the phrase 'attorney-in-charge' had special significance under the Local Rules in the Southern District of Texas?

Schlotter: No, I was not.

MR's Attorney: Have you since read the Local Rules of the Southern District of Texas?

Schlotter: Yes, I have.

MR's Attorney: Are you, under those Rules, the attorney-in-charge of the Parsley matter?

Schlotter: No.

MR's Attorney: Did you sign the initial pleading, the motion for relief filed in the Parsley matter that brings us down here today?

Schlotter: No.

MR's Attorney: Were you designated as the attorney-in-charge under the Southern District of Texas Local Rules?

Schlotter: No.

MR's Attorney: Did you mean to answer to the Court and to [the UST] that you were the attorney-in-charge under the Local Rules in the Southern District of Texas?

Schlotter: No, I did not. I did not comprehend the concept because I hadn't read the Local Rules.

[Aug. 8, 2007 Hr'g Tr. 17:14–18:10.]

Thomas testified that Barrett Burke was the "lead counsel for the Motion for Relief in the Southern District of Texas." [Aug. 7, 2007 Hr'g Tr. 42:16–17.] Her testimony conflicted with Schlotter's testimony at the March 5, 2007 hearing when he testified that he was the attorney-in-charge. That two seasoned attorneys at McCalla Raymer can have such a difference of opinion on this important point once again underscores the lack of training at McCalla Raymer.

Daffin correctly testified that Sanov was the attorney-in-charge pursuant to District Court Local Rule 11.2 because Sanov signed the Motion. [July 27, 2007 Hr'g Tr. 339:12–340:19.] Daffin further stated that this Local Rule requires the attorney-in-charge to appear at a hearing or to send an attorney who is fully informed and with authority to bind the client. [*Id.*] She also stated that it was therefore acceptable for Thurmond, as opposed to Sanov, to appear at the February 6, 2007 hearing so long as Thurmond was fully informed and had authority to bind Countrywide. [*Id.*]

The Court agrees with Daffin's testimony and interpretation of Local Rule 11.2.

However, her testimony places her firm in an awkward position. If Thurmond was fully informed about the Parsley file, which this Court believes he was, then he knowingly made a misrepresentation to this Court while an associate at Barrett Burke. The alternative explanation of his misrepresentation to this Court—that the Motion was a "good motion"—is that he lacked full knowledge of the file, which would put him in violation of Local Rule 11.2. Under these circumstances, Sanov, the attorney-in-charge and also an associate at Barrett Burke, would have sent another attorney from Barrett Burke, i.e. Thurmond, to the hearing without full knowledge of the file. This scenario means that both Sanov and Thurmond would have been in violation of Local Rule 11.2, and, as associates at Barrett Burke, their actions are imputed to the firm. *See Religious Tech. Ctr. v. Liebreich,* 98 Fed. Appx. 979, 988 n. 30 (5th Cir.2004) (imposing sanctions under 28 U.S.C. § 1927 jointly and severally against attorneys and their law firm).

**D. Does Countrywide have a policy not to assess the borrower any attorney's fees and costs for filing a motion to lift stay when Countrywide later withdraws the motion due to its own errors or the errors of its counsel?**

Both Ortiz, at the March 5, 2007 hearing, and Smith, at the August 8, 2007 hearing, testified that Countrywide does not charge borrowers in bankruptcy for any attorney's fees and costs incurred by Countrywide in connection with any motion to lift stay that is subsequently withdrawn by Countrywide; however, they also conceded that Countrywide has never committed this policy to writing. [March 5, 2007 Hr'g Tr. 71:24–72:20; Aug. 8, 2007 Hr'g Tr. 134:16–135:14.] In the case at bar, Countrywide did *not* reclassify the fees and costs associated with the Motion as non-recoverable until *after* this Court issued the First Show Cause Order. In spite of Countrywide's alleged unwritten policy of not charging debtors for fees related to motions that are withdrawn due to Countrywide's errors, Countrywide was charging those fees to the Debtor until the Court raised the issue.

Ortiz testified as follows about Countrywide's practice of waiting until the time of discharge to determine whether fees are recoverable from borrowers/debtors:

> BB counsel: At some point in the bankruptcy case, is there a reconciliation of discrepancies in the accounts?
>
> Ortiz: Yes.
>
> BB counsel: When does that happen?
>
> Ortiz: That generally happens when the loan is discharged—
>
> BB counsel: Okay.
>
> Ortiz: —and the case is completed and a thorough review of all transactions and fees are done to determine and make sure that the POC has been paid in full, that if there has been any actions on the case that the fees that have been assessed are proper and that we are abiding by any either court orders or if something was withdrawn, that we have, you know, properly reassessed those fees. And then it is also then reviewed and audited by the team leader before it gets sent on to the next stage.
>
> BB counsel: Okay. So at the end of a bankruptcy case, in this case, a Chapter 13 discharge, successful completion of the plan, that process is done to the file and are reconciliations or eliminations of erroneous charges made at that time?
>
> Ortiz: They can be, yes.
>
> BB counsel: Okay. Assuming there is an erroneous charge, is that the case—
>
> Ortiz: Assuming, yeah.

[Aug. 10, 2007 Hr'g Tr. 34:10–35:10; 36:13–37:4.]

Smith also testified that the charges related to the Motion will be removed only when the Debtor receives his discharge:

UST: This $550 was part of the fee that Countrywide had assigned to Mr. Parsley for the filing of the withdrawn Motion for Relief from Stay; was it not?

Smith: That's correct.

UST: And then there's the $150, which was the court costs for the filing of that withdrawn Motion for Relief from Stay, correct?

Smith: That's correct.

UST: And we see two entries again on March 12th, 2007. And the last entry on March 12th after all the reclassification has been done, what is the balance on Mr. Parsley's account for the fees he owes to Countrywide?

. . .

Smith: Twelve thousand sixty or, I'm sorry, $1,260.53 would be the balance. Now, but did you say that would be owed by Mr. Parsley?

UST: Isn't that what the balance shows?

Smith: Well, no, not directly. That would be the balance that would be in the fees due. However, again, that would not be chargeable because it's been reclassified. So once the loan was completed it would actually be—it would go through a process we call "book loss" to actually book the fees off of the loan.

UST: Why is [sic] there two entries on March 12th as debits in the amount of $550 and $150? Why do you debit it, which increases the balance total back to what it was before you re-classed these fees for the withdrawn Motion for Relief from Stay?

Smith: Again, it's—it would be an internal accounting function. Again, that's part of the book loss process that I spoke about before. But it would be reclassified, so Mr. Parsley would not have been charged for that.

UST: But the running balance reflected in your system has it the same amount, correct?

Smith: It has a running total of the same amount. But, again, it's being reclassified to a nonclaimable amount. So when the loan is completed we book that item off of the system. It's just an accounting function.

UST: Mr. Parsley's loan is a 30-year loan, correct?

Smith: That's correct.

UST: So in 2029 someone at Countrywide is going to remember to go back and book loss this amount?

Smith: No. Actually, this would occur—in this case in the bankruptcy context we would book loss the loan as soon as—typically, as soon as it would come out of the bankruptcy environment.

. . .

UST: Where on Countrywide's system would the balance be reflected that Mr. Parsley owes?

Smith: He would have to—and I'm not aware if you can create a report to show, to just pull out the recoverable items. But you would have to add up those items that were fees due and showing as in a code that would be owed by the borrower.

UST: So Mr. Parsley has to hope that five years or so from now when his Plan ends someone from Countrywide is going to go back and do this math correctly?

Smith: Well, we have a book loss department within the finance group

that actually is responsible for doing just that.

UST: But Countrywide can't even get it right when it files an Amended Proof of Claim a month later from reclassifying these fees as non-recoverable, correct?

Smith: Again, the Amended Proof of Claim was filed without direct correspondence, communication as to what was going to be revised at that time for the Amended Proof of Claim.

[Aug. 8, 2007 Hr'g Tr. 256:9–260:1.]

The Court cannot understand why Countrywide does not determine whether the debtor is charged with the fees and costs *at the time the motion is withdrawn* rather than at the time the debtor receives a discharge—which can be several months, if not years, after the withdrawal of the motion. [Aug. 8, 2007 Hr'g Tr. 138:9–20.] Smith wants this Court to believe that, in the case at bar, when the Debtor receives a discharge two and a half years from now, Countrywide will ensure that the fees and expenses associated with the Motion will not be charged to him.[16] Given the myriad of errors in the case at bar, the Court doubts Countrywide would take such action. Indeed, Smith conceded that Countrywide would not have even thought about refraining from imposing these fees and costs on the Debtor if this Court had not issued the First Show Cause Order. [Aug. 8, 2007 Hr'g Tr. 263:9–14.] Left unanswered is the question of what happens if the Debtor's Chapter 13 case is dismissed. Since those fees have not been written off and still appear on the account, there is nothing to stop Countrywide from reclassifying those fees back to the "recoverable" category and charging them to the Debtor.

If a written policy actually existed stating that Countrywide would not charge debtors for fees and costs associated with its withdrawn motions, then that policy should demand that the charge be reclassified *immediately* after the motion is withdrawn. A Countrywide employee should not need to determine the status of those fees several months or years later. This reluctance, if not refusal, to immediately reclassify these fees as unrecoverable has called into question whether Countrywide had any such unwritten policy when Ortiz and Smith testified in August of 2007; or, if such a policy existed, whether Countrywide did anything to properly enforce it.

During closing arguments on December 12, 2007, counsel for Countrywide addressed the Court's concern over Countrywide's failure to commit to writing a policy stating that it would not charge debtors for motions to lift stay that are later withdrawn due to Countrywide's error. Counsel informed the Court that, as a result of the show cause hearings, Countrywide now had a policy in writing to this effect. [Dec. 12, 2007 Hr'g Tr. 67:21–24.] The Court requested to see a copy of this written policy [Dec. 12, 2007 Hr'g Tr. 74:14–23], and Countrywide submitted a document for *in camera* inspection on December 14, 2007. After reviewing the relevant language in this document, the Court does not understand why Countrywide would believe that this document contains a policy that Countrywide will not charge debtors for fees and costs associated with motions that it withdraws due to inaccurate factual allegations. What Countrywide submitted is not an instruction or a policy; it is simply an explanation of how a Countrywide employee would code fees as not

---

16. The Debtor's Chapter 13 plan was confirmed on February 27, 2006. [Docket No. 23.] Thus, because his plan is a 54 month plan, he will receive a discharge in August of 2010, i.e. two and a half years from now.

chargeable to the borrower.[17] Nothing has changed. Countrywide may have the ability to code fees as non-chargeable, but it has not shown this Court a commitment to write off these fees.

This Court is certainly not going to write Countrywide's policies. However, given the representation made by Countrywide's counsel, the Court expected a plain and simple sentence declaring that Countrywide will not charge borrowers any fees related to any motion to lift stay withdrawn as a result of Countrywide's own errors. Countrywide appears unwilling to take this basic step towards accepting responsibility for motions which are incorrectly filed based upon its own errors and the mistakes of its counsel.

Moreover, Countrywide represented that it has not changed its practice of determining whether fees are recoverable at the time of discharge. There is no justifiable reason that these types of fees cannot be *immediately* written off. If Countrywide allows up to five years to pass before deciding whether to charge a debtor for these fees, it is very likely that a debtor, who may not have the assistance of counsel at that point, will be willing to pay these fees out of a desire to extricate himself from bankruptcy and move on with his life.[18] When asked why this policy had not been changed, and why Countrywide

was still waiting until discharge to make the non-recoverability determination, its counsel responded, "Your Honor, I'm not prepared to answer that question today." [Dec. 12, 2007 Hr'g Tr. 80:23–24.] Countrywide's unwillingness to put into effect a straight-forward policy and to reconsider when fees are deemed non-dischargeable makes this Court all the more concerned about Countrywide's policies.

### E. The general conduct of Barrett Burke, McCalla Raymer, and Countrywide in connection with the Motion

The issues discussed above were specifically enumerated in the Second Show Cause Order. Due to the UST's thorough investigation and examination, the Court heard testimony on many other issues regarding miscellaneous conduct of Barrett Burke, McCalla Raymer, and Countrywide which related to the Motion specifically and to their business practices generally. The Court would be remiss if it failed to address these other issues which in some cases are as, if not more, disconcerting than the ones already discussed above. Primarily, this analysis is organized around the flow of information through the system created by the parties in this case. Tracing the steps leading up to the filing of the Motion shows that this is an assem-

---

**17.** Because this document was submitted for *in camera* inspection only, the Court will not directly quote the language to which it refers. Further, in fairness to Countrywide, after it reads this Memorandum Opinion, if it believes that the Court is incorrect, the Court will allow Countrywide to file the document with the Clerk of Court and the Court will amend this Memorandum Opinion to include the verbatim language in the document as an addendum. Countrywide shall have ten (10) days from the entry of this Memorandum Opinion on the docket to file this document with the Court.

**18.** The Debtor's Chapter 13 petition was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Thus, his plan will last only 54 months. However, with a certain narrow exception, all Chapter 13 cases filed after BAPCPA must last 60 months unless unsecured creditors receive payment in full of their claims. *See* 11 U.S.C. § 1325(b)(4)(A) and (B). Accordingly, in most cases, under Countrywide's present policy of deciding whether the fees and costs are recoverable only at the date of discharge, this decision will not be made until five years after the confirmation of the plan.

bly line process. There are attorneys involved throughout this process that should be catching these errors. However, the attorneys, do not dedicate sufficient time and care to ensure adequate quality control. Eventually, despite being passed through the hands of several paralegals and attorneys, the Court receives an erroneous motion that should never have been filed.

### 1. Countrywide's Payment History

This process begins with Countrywide and, ultimately, must end with Countrywide because the actions of McCalla Raymer and Barrett Burke were done on behalf of Countrywide. As Ortiz testified, the mistakes Countrywide made in the Debtor's payment history are the root cause of the Motion being filed. As previously stated, she conceded that Countrywide did not acknowledge the Debtor's bankruptcy filing in their electronic files until several days after he filed and Countrywide had received notice of the filing. [March 5, 2007 Hr'g Tr. 68:12–24.] Thus, the Debtor's postpetition payment on November 9, 2005 was posted as a pre-petition payment, and Countrywide's records indicated that the Debtor missed his first post-petition payment. Although this was not the only mistake in the payment history that the Court eventually received, it was the first.

Ortiz also testified that no one at Countrywide reviews pleadings before they are filed on its behalf, and in this case no one at Countrywide looked at the final payment history attached to the Motion. [March 5, 2007 Hr'g Tr. 68:12–24; 69:9–70:13.] This hands off approach is consistent with the no communication clause be-

tween Countrywide and its local counsel, such as Barrett Burke. Countrywide's attitude is that once it has referred the file to national counsel, it does not want to be bothered with any details about the pleadings and proceedings which follow.

Additionally, Smith testified that Countrywide has been asked by courts to clarify the payment histories that it has submitted with motions to lift stay. [Aug. 9, 2007 Hr'g Tr. 197:20–24.] Indeed, he stated that such requests have been "happening more and more frequently." [19] [Aug. 9, 2007 Hr'g Tr. 197:25–198:2.] The next step in the process is for Countrywide to transmit this inscrutable pay history to McCalla Raymer.

### 2. Simplified payment histories prepared by McCalla Raymer legal assistants

Thomas testified that, in the spring of 2006, McCalla Raymer "made a business decision to create a separate entity known as MR Default Services, which provided non-legal support services to the law firm." [Aug. 7, 2007 Hr'g Tr. 23:14–20.] This new entity employs 300–350 legal assistants formerly employed directly by McCalla Raymer. [Aug. 7, 2007 Hr'g Tr. 163:6–9.] These legal assistants perform the same functions as when they were direct employees of McCalla Raymer. [Aug. 7, 2007 Hr'g Tr. 24:11–18.] The attorneys at McCalla Raymer continue to oversee and control the legal assistants at MR Default Services. [Aug. 7, 2007 Hr'g Tr. 24:19–21.] It is these legal assistants who, upon receipt of Countrywide's loan history, create a simplified loan history which the McCalla Raymer attorney delivers to local counsel such as Barrett Burke.

---

**19.** Schlotter testified that McCalla Raymer received similar complaints from various courts about the complexity of Countrywide's loan histories. To use Schlotter's own words,

courts want to see a loan history "that somebody who doesn't have an accounting background can read." [March 5, 2007 Hr'g Tr. 81:7.]

Yet, no attorney at McCalla Raymer ever reviews the simplified loan history for its accuracy.[20] [Aug. 7, 2007 Hr'g Tr. 164:19–165:6.]

According to Thomas, these legal assistants do—to use her words—a "cut and paste" job using the Countrywide loan history [Aug. 7, 2007 Hr'g Tr. 63:23; *see also* 165:18.], suggesting that there is no need for any attorney at McCalla Raymer to be concerned about the accuracy of the simplified loan histories. Yet, the MR Default Services employee, LaToya President (Ms. President), who converted the Debtor's loan history from the Countrywide version to the McCalla Raymer version, admitted that she made a mistake in this case. She testified that when she did the cutting and pasting, she created the inaccurate payment history, not reviewed by an attorney at McCalla Raymer, which was delivered to Barrett Burke.

The following exchange between McCalla Raymer's counsel and Ms. President is telling:

MR's Attorney: Okay. What happened here?

Ms. President: In the process of cutting and pasting and deleting, I deleted the mortgagor's [monthly payment] versus the trustee [i.e. the trustee's payment to Countrywide].

MR's Attorney: Which you had pulled from the webpage; you deleted the wrong—

Ms. President: The wrong—

MR's Attorney: —entry.

Ms. President: Correct.

. . .

MR's Attorney: Is the May 5th payment here at the top of the page, is that the one you deleted in error?

Ms. President: Correct.

MR's Attorney: And the May 8th payment is the one you placed on the payment history in error?

Ms. President: Correct.

[Aug. 8, 2007 Hr'g Tr. 100:12–18; 101:23–102:3.]

This Court understands that mistakes happen, and it is by no means upset or unhappy with Ms. President. What this Court does not understand is why Countrywide's original loan payment history is so complex that McCalla Raymer, through MR Default Services, must simplify the history so that this Court—and other courts—will be able to comprehend the payment history. Is it too much to ask of Countrywide, or any mortgagee or servicer, to generate a payment history that does not have to be simplified by legal assistants who inevitably will make mistakes? Countrywide's payment histories are so complex that judges, attorneys, and borrowers have difficulty understanding them. Indeed, these payment histories are sufficiently confusing that many debtors, and their attorneys, are unable to determine if Countrywide has overcharged them.

3. **The need for Barrett Burke employees to confirm the accuracy of payment histories pursuant to Barrett Burke policy**

The next step on this assembly line is for McCalla Raymer to forward the file to local counsel, which was Barrett Burke in the case at bar. Reilly conceded that when McCalla Raymer referred the Debtor's file to Barrett Burke requesting for Barrett Burke to file a motion to lift stay, the file "fell through the cracks" [July 27, 2007 Hr'g Tr. 55:4–5], and that Sanov, not

---

**20.** If courts throughout the country have complained that Countrywide's original loan histories are too complex to decipher, then attorneys at McCalla Raymer should be reviewing the simplified payment histories that the legal assistants are constructing.

he, ended up signing the Motion because he was on vacation. Reilly testified that all Barrett Burke employees are supposed to confirm the accuracy of all payment histories prior to the filing of any motion to lift stay, and conceded that Sanov would have been in violation of this Barrett Burke policy if she filed the Motion without doing such a check. [July 27, 2007 Hr'g Tr. 57:12–19 and 57:25–58:3.]

Sanov testified that, between December 11, 2006 (when Barrett Burke received the referral from McCalla Raymer) and December 29, 2006 (when she filed the Motion), neither she nor anyone else at Barrett Burke checked with McCalla Raymer or Countrywide to confirm whether the payment history needed to be updated. [July 27, 2007 Hr'g Tr. 213:20–23.] Had anyone taken the time to check, they would have discovered that the Debtor had made a payment on December 13, 2006.

Since neither Sanov nor Reilly verified the accuracy of the payment history before the Motion was filed, the Court received a motion to lift stay riddled with errors that could have—and should have—been caught by any number of attorneys whose hands it passed through on the way to the docket. Unlike McCalla Raymer, Barrett Burke at least acknowledges that its attorneys bear the responsibility of checking the accuracy of the payment history and deficiencies before filing motions to lift stay. Unfortunately, quality control does not appear to have been a priority at Barrett Burke, and its attorneys filed the Motion without verifying the factual basis underlying this pleading.

### 4. The proofs of claim filed by McCalla Raymer

Countrywide, McCalla Raymer, and Barrett Burke vociferously objected on

grounds of relevancy to the introduction of any evidence about the Countrywide proof of claim, and two amendments thereto, that were filed in the case at bar. The parties argued that neither the First Show Cause Order nor the Second Show Cause Order referenced Countrywide's proof of claim. [Dec. 12, 2007 Hr'g Tr. 25:2–12.]

Yet, Sanov, the Barrett Burke attorney who signed the Motion, testified that "[i]f there are mistakes in the proof of claim, those mistakes were transposed onto the Motion for Relief From Stay." [Aug. 10, 2007 Hr'g Tr. (afternoon session) 86:18–20.] Indeed, Sanov reviewed the proof of claim in preparing the Motion. [Aug. 10, 2007 Hr'g Tr. (afternoon session) 74:4–19.] She testified that she used the proof of claim to determine what figure she should include in the Motion for prepetition arrears owed by the Debtor. [*Id.; see also* Aug. 10, 2007 Hr'g Tr. (afternoon session) 79:11–16; 80:22–81:1; 83:3–11; 117:2–4.] Thus, the Court concluded that evidence regarding the proof of claim was relevant to the Show Cause Orders because it might help to explain some of the inaccuracies in the Motion. Accordingly, the parties' objections were overruled and the UST proceeded to examine the errors in the proof of claim filed in this case.

### a. Errors in the Original Proof of Claim that caused McCalla Raymer to file the First Amended Proof of Claim on behalf of Countrywide

On January 4, 2006, pursuant to Countrywide's authorization, McCalla Raymer filed a proof of claim in the Debtor's Chapter 13 case (the Original Proof of Claim).[21]

---

21. Although Countrywide authorizes the filing of proofs of claim, it does not review or sign any of the proofs of claim filed on its behalf by outside counsel such as McCalla Raymer.

[Aug. 7, 2007 Hr'g Tr. 251–52; Proof of Claim 5–1.] During Thomas' 2004 examination, the U.S. Trustee questioned the basis of a $65.00 charge in the Original Proof of Claim included under "Pre–Petition Attorney Fees and Costs." [Aug. 7,2007 Hr'g Tr. 124:14–125:4.] Thomas testified that McCalla Raymer was never able to "reconcile" this additional $65.00. [Aug. 7.2007 Hr'g Tr. 124:25–125:4.] Smith testified that this $65.00 charge in the Original Proof of Claim appeared to be a duplication of another charge. [Aug. 8,2007 Hr'g Tr. 229:14–230:11.]

Thomas also testified that a different $65.00 charge itemized as "Obtaining Loan Documents" was for work done in connection with the Debtor's prior bankruptcy. However, McCalla Raymer did not actually perform the work until after the Debtor had filed his current bankruptcy. Therefore, McCalla Raymer decided to remove this $65.00 charge from its claim out of "an abundance of caution." [22] [Aug. 7,2007 Hr'g Tr. 7:7–24,205:5–14.] As a result of the UST effectively challenging the basis for these two $65.00 charges, McCalla Raper filed an amended proof of claim on July 19,2007, which reduced the pre-petition attorney fees and costs by $130.00 (the First Amended Proof of Claim). [Aug. 7, 2007 Hr'g Tr. 12414–125:4.] Countrywide authorized McCalla Raymer to file the First Amended Proof of Claim and again did not review it before being filed. [Aug. 9, 2007 Hr'g Tr. 268:13–269:1.]

**b. Additional errors and inconsistencies not corrected in the First Amended Proof of Claim**

Aside from the removed $130.00, there were additional mistakes and inconsistencies in the Original Proof of Claim that neither McCalla Raymer nor Countrywide corrected in the First Amended Proof of Claim. [Aug. 8, 2007 Hr'g Tr. 254:14–16.]

**i. Overcharging of late fees**

The original Proof of Claim and the First Amended Proof of Claim both list $243.36 for late charges. [Proof of Claim 5–1; Proof of Claim 5–2.] Countrywide's bankruptcy ledger also indicates that the Debtor owed Countrywide $243.36 in late charges. [Gov't Ex. 25.] By contrast, Countrywide's Master Servicing Loan History indicates that the Debtor owed only $101.40 in late charges as of the filing date of his petition in this case.[23] [Gov't Ex. 24.] McCalla Raymer's Proof of Claim worksheet lists the late charges as both $101.40 and $243.36. [Gov't Ex. 3D.] Smith, the First Vice–President of Foreclosure and Bankruptcy at Countrywide, could not explain the discrepancy between the two amounts, nor could he state which amount was accurate. [Aug. 8, 2007 Hr'g Tr. 229:2–231:12.]

**ii. Charging for non-recoverable fees**

Thomas testified that McCalla Raymer makes recommendations to Countrywide as to the recoverability of McCalla Ray-

[Aug. 8, 2007 Hr'g Tr. 155:25–156:2; Aug. 9, 2007 Hr'g Tr. 278:21–279:3.]

**22.** There was another $200.00 charge for closing costs related to the Debtor's prior bankruptcy that occurred post-petition. Thomas was unable to explain why McCalla Raymer removed the $65.00 charge because it occurred post-petition, but failed to remove this $200.00 charge which also occurred post-petition. [Aug. 7, 2007 Hr'g Tr 130:21–131:17]

**23.** The documents comprising the Master Servicing Loan History evidence the Debtor's loan in a certain format. This format differs from the format set forth in what Countrywide calls the "bankruptcy ledger." Although the formats are different, both relate to the Debtor's loan history. As noted above, Smith was unable to explain why these two documents would have differing amounts.

mer's fees and costs in the invoices McCalla Raymer submits. [Aug. 7, 2007 Hr'g Tr. 129:11–130:5.] In the case at bar, on November 15, 2005, McCalla Raymer sent Countrywide an invoice for $321.00 which included the recommendation that the following charges were non-recoverable: $21.00 for "obtaining court dockets;" $65.00 for "obtaining loan documents;" and $35.00 for "court record costs." The remaining $200.00 of attorney's fees was listed as recoverable. [Gov't Ex. 48.]

The next day Countrywide created its own version of the McCalla Raymer invoice. The Countrywide version of the invoice indicated that, contrary to the McCalla Raymer invoice, the $200.00 in attorney's fees were non-recoverable. Smith testified that he did not how or why the $200.00 charge for attorney fees came to have a parenthetical notation as "non-recoverable," when it had no such notation on McCalla Raymer's invoice. [Aug. 9, 2007 Hr'g Tr. 208:6–11.] Countrywide then charged the entire $321.00 to the Debtor's account despite McCalla Raymer's invoice listing $121.00 in fees as non-recoverable and Countrywide's own invoice listing all the fees as non-recoverable. [Gov't Ex. 725.4; Aug. 9, 2007 Hr'g Tr. 209:17–25.] Thus, when McCalla Raymer filed the original Proof of Claim, it included all $321.00 of the fees even though the firm had already advised Countrywide through its invoice that $121.00 of that amount was non-recoverable and Countrywide's own invoice listed none of these fees as recoverable. [Proof of Claim 5–1.]

Thomas justified this inconsistency by shifting the blame from McCalla Raymer to Countrywide. She testified that McCalla Raymer's invoice is just a recommendation as to recoverability which Countrywide is free to reject. [Aug. 7, 2007 Hr'g Tr. 129:11–130:5.] Conversely, Smith shifted the blame from Countrywide back to McCalla Raymer. He testified that McCalla Raymer, when inputting its invoice, had failed to code its fees properly, which resulted in the fees being listed on the Original and Amended Proofs of Claim. [Aug. 9, 2007 Hr'g Tr. 230:2–22.] Smith added that in the wake of the show cause hearings, Countrywide intended to conduct audits to ensure that the coding is correct and that Countrywide and its counsel agree on how to input information properly. [Aug. 9, 2007 Hr'g Tr. 231:13–25.]

### iii. Countrywide's internal reclassification of fees as non-recoverable

Ortiz testified that after looking at the hard copy of McCalla Raymer's invoices, she learned that the attorney's fees and costs listed on the Original Proof of Claim had been incorrectly classified as recoverable. [Aug. 10, 2007 Hr'g Tr. (morning session) 25:15–26:6.] On June 20, 2007, Ortiz reclassified the attorney's fees and costs on Countrywide's system so that all $321.00 would be designated as non-recoverable. [*Id.*; Gov't Ex. 725.4.] Ortiz did not inform anyone at Countrywide or McCalla Raymer of her actions, however, and was unaware of any proposal or intention to file the First Amended Proof of Claim. [Aug. 10, 2007 Hr'g Tr. (morning session) 26:7–12.] Thus, McCalla Raymer included the non-recoverable fees and costs in First Amended Proof of Claim. Because Countrywide does not review its own proofs of claim, Ortiz did not see the First Amended Proof of Claim before it was filed. She testified that if she had seen the attorney's fees and costs still listed on the First Amended Proof of Claim, she would have informed McCalla Raymer and her own supervisor at Countrywide that those fees were unrecoverable. [Aug. 10, 2007 Hr'g Tr. Vol. 1 25–26.]

The following exchange between counsel for the UST and Smith underscores the potential for mistakes when Countrywide (the client) fails to communicate with McCalla Raymer (its counsel):

UST: You just testified that Countrywide reclassified this $321 in fees because it doesn't believe them to be recoverable from the borrower, correct?

Smith: I believe that Ms. Ortiz reclassified these fees and costs, again, in an abundance of caution on behalf of Countrywide based on these proceedings.

UST: Sir, my question was not what Ms. Ortiz did, my question is: Countrywide does not believe these fees to be recoverable and that's why they were reclassified, correct?

Smith: I would say this. What we believe is that, again, we're going to act upon the advice of counsel. If these were deemed to be fees and costs that should not be recovered by the borrower, we certainly are going to stand behind that and would reclassify as a result.

UST: And, in fact, according to Government Exhibit 725.4, we see the reclassification of these fees on June 20th, 2007, correct?

Smith: That's correct.

UST: And so that's an acceptance by Countrywide that they're not going to charge Mr. Parsley for these fees, correct?

Smith: That's correct.

UST: So can you tell me, sir, why a month later in the Amended Proof of Claim you included $256 in prepetition fees?

Smith: I cannot.

UST: That's wrong isn't it?

Smith: I would say so.

UST: Because Countrywide has reclassified those as not recoverable.

Smith: That's correct.

UST: So this Amended Proof of Claim filed by Mr. Schlotter is itself incorrect, is that right?

Smith: That would be correct.

[Aug. 8, 2007 Hr'g Tr. 253:8–254:16.]

### iv. Improperly including post-petition, pre-confirmation attorney fees and disclosing a lesser amount than was actually charged to Countrywide and the Debtor

The Original Proof of Claim and the First Amended Proof of Claim included $350.00 in postpetition, pre-confirmation fees for filing the Original Proof of Claim. The official proof of claim form B–10 states that any arrearages to be included in the claim shall be those incurred "*at time case filed.*" [Proof of Claim 5–1; Proof of Claim 5–2] (emphasis in original). The plain meaning of this language is that arrearages incurred after the case was filed should not be included in a proof of claim.

Thomas testified that she believed it was acceptable for oversecured creditors to list post-petition, pre-confirmation fees on a proof of claim, and thereby avoid complying with § 506(b) or Rule 2016. [Aug. 7, 2007 Hr'g Tr. 240–41.] Thomas added that McCalla Raymer did not need to comply with the UST's disclosure guidelines for fee applications because a proof of claim is not a fee application. [Aug. 7, 2007 Hr'g Tr. 241–43.]

■ Thomas—and McCalla Raymer—are sorely misinformed. This Court has previously held that a creditor holding a lien solely on the debtor's principal residence, such as Countrywide in the case at bar, may assess post-petition, pre-confirmation charges pursuant to § 506(b), but only by filing a Rule 2016 application. *In*

re Sanchez, 372 B.R. 289, 303–05 (Bankr. S.D.Tex.2007) (holding that "the entity seeking reimbursement for expenses from the estate has the burden to file Rule 2016 disclosures and show that its charges are reasonable as required by § 506(b)"). Thus, the $350.00 in post-petition, pre-confirmation fees do not belong on a proof of claim. They belong in a Rule 2016 application, with all of the concomitant disclosure.

The testimony in this proceeding reveals the benefit of requiring creditors to file a Rule 2016 application to recover post-petition, pre-confirmation fees. Thomas testified that although the Original and Amended Proofs of Claim listed the amount of post-petition, pre-confirmation fees as $350.00, McCalla Raymer in fact charged Countrywide $450.00. [Aug. 7, 2007 Hr'g Tr. 132:10–22.] Thomas stated that McCalla Raymer listed the post-petition fees as being only $350.00 because "It is our experience that in jurisdictions where there are not specific either prohibitions of—about obtaining—of collecting post-petition fees without specific Court order, or where they're not allowed at all, that $350 is generally viewed as a reasonable fee for post-petition services as we itemize and make known to the Debtor, Debtor's attorney, and the Court." [Aug. 7, 2007 Hr'g Tr. 133:1–6.]

Smith confirmed that Countrywide passed on the charges for the full $450.00 to the Debtor's account. [Aug. 9, 2007 Hr'g Tr. 19:6–10.] Smith could provide no justification as to why only $350.00 was listed in the Original Proof of Claim and the First Amended Proof of Claim when the actual amount charged to the Debtor was $450.00. [Aug. 9, 2007 Hr'g Tr. 19:15–19.] Thus, the Debtor, through his confirmed plan, has been paying off the $350.00 set forth in the Proof of Claim. This unknowing underpayment will even-

tually leave the Debtor in the lurch: once his plan payments are completed, contrary to his belief that he has paid off this assessment, he will still owe $100.00 (plus any interest that Countrywide has charged on this $100.00) before he will be able to convince Countrywide to execute a release of lien.

### c. The Second Amended Proof of Claim

On October 1, 2007, nearly two months after four days of testimony laying bare the extensive problems with the original Proof of Claim and First Amended Proof of Claim, Countrywide filed a Second Amended Proof of Claim. This Second Amended Proof of Claim was signed by John Smith and not by an attorney at McCalla Raymer. [Proof of Claim 8–1.] The Second Amended Proof of Claim did not include any of the late charges, pre-petition attorneys' fees and costs, or post-petition fees discussed above. [*Id.*] However, Countrywide included the following notice: "By filing this Second Amended Proof of Claim, Countrywide Home Loans, Inc. does not concede that amounts listed in the Amended Proof of Claim are not recoverable from the Debtor's estate, but rather waives its right to collect such amounts." This statement is cavalier in light of the fact that Countrywide's own representative admitted that, at a minimum, the pre-petition attorneys' fees and costs were not recoverable. Given the testimony presented above, it is disconcerting that Countrywide continued this awkward posturing. Despite all of the errors made by Countrywide and its attorneys in the case at bar, Countrywide continues to leave the door open for collecting these fees.

### 5. The Motion was filed in violation of Fannie Mae guidelines

Schlotter testified that under Fannie Mae guidelines for loans serviced by Coun-

trywide, a motion to lift stay should not be filed unless the debtor is 60 days delinquent. [Aug. 8, 2007 Hr'g Tr. 11:1–18.] Smith confirmed that Fannie Mae guidelines dictate that the Motion should not have been filed because the Debtor was not 60 days in default. [Aug. 8, 2007 Hr'g Tr. 149:10–16; Aug. 9, 2007 Hr'g Tr. 36:21–24.] Ortiz also testified that it was a mistake for Countrywide to refer the Debtor's file to McCalla Raymer because the Debtor was not 60 days delinquent. [Aug. 10, 2007 Hr'g Tr. 19:19–20:7; 85:4–14.]

From time to time during the hearing, Barrett Burke argued that even though the Motion should not have been filed under Fannie Mae guidelines, the Debtor was nevertheless one post-petition payment in arrears and that this fact was a sufficient legal basis for filing the Motion. [Dec. 12, 2007 Hr'g Tr. 22:18–19.] Indeed, in an attempt to justify his stating that the Motion was a "good motion," Thurmond had the following exchange with counsel for Barrett Burke:

Counsel: Did the existence of one payment default have any impact on your assessment of the motion to the Court?

Thurmond: Right. Yes, it did because if there was zero default, then it would have been a completely bad motion. If there's a default or multiple defaults, it's a different situation.

[July 27, 2007 Hr'g Tr. 354:5–9.]

The Court is skeptical of Barrett Burke and Thurmond's attempt to disregard the Fannie Mae guidelines in order to justify filing the Motion with only one delinquent post-petition payment. Given that Barrett Burke—and, for that matter, McCalla Raymer—adhere to all other Fannie Mae guidelines, the justification articulated by Barrett Burke and Thurmond is less than compelling. The fact remains that the Debtor was only one payment in default, not three as alleged in the Motion, and Thurmond should have responded with a simple "yes" when the Court asked if the Motion contained inaccurate factual allegations. Additionally, Thurmond's later justification of his "good motion" answer is inconsistent with Fannie Mae policy. Thus, if all of the facts had been correctly stated in the Motion, it should not have been filed and was not a "good motion" under the very Fannie Mae guidelines followed by Barrett Burke.

### 6. The inaccurate factual allegations in the Motion

However, all the facts were not correctly stated in the Motion. Reilly conceded that the Motion contained inaccurate factual allegations because the payment history attached to the Motion failed to account for the Debtor's November 9, 2005 payment, May 6, 2006 payment, and December 13, 2006 payment. [July 27, 2007 Tr. 108:7–19; *see also* 112:20–113:17.] Likewise, Sanov testified that the payment history attached to the Motion was neither accurate nor current despite the representation in the Motion that "the attached payment history is a current payment history reflecting all payments, advances, charges, and credits from the beginning of the loan." [July 27, 2007 Hr'g Tr. 212:17–19.] As stated previously, a simple call to McCalla Raymer or Countrywide asking for an updated payment history would have revealed the existence of the Debtor's December 13, 2006 payment.

At the March 5, 2007 hearing, Ortiz testified that Countrywide did not receive notice of the Debtor's bankruptcy filing until November 15, 2005, thereby leading this Court to believe that Countrywide made an innocent mistake when it reported the Debtor's November 9, 2005 payment as a prepetition payment instead of a

post-petition payment. [March 5, 2007 Hr'g Tr. 58:4–12.] At the August 10, 2007 hearing, however, Ortiz conceded, under cross examination by the UST, that her testimony at the March 5, 2007 hearing was false. [Aug. 10, 2007 Hr'g Tr. 80:17–81:5.] Indeed, she admitted that her own involvement in the Debtor's file began on November 3, 2005, and that Countrywide's own records revealed that the Debtor had called Countrywide on November 2, 2005 to report that he had filed a bankruptcy petition on October 13,2005. [Aug. 10, 2007 Hr'g Tr. 81:6–16.] Ortiz also conceded she did not avail herself of the opportunity to correct her inaccurate testimony between March 5, 2007—when she first took the stand-and August 10, 2007—when she took the stand a second time.[24] [Aug. 10, 2007 Hr'g Tr. 105:2–9.] This is further evidence of the sloppy practices and training at Countrywide. Moreover, Ortiz's failure to correct her prior incorrect testimony reflects poorly on her credibility with this Court.

Regarding the Debtor's November 9, 2005 payment and its erroneous application in the payment history attached to the Motion, Smith conceded that it was Countrywide's fault that this payment was not reflected as a post-petition payment. [Aug. 8,2007 Hr'g Tr. 142:18–21.] However, Smith blamed Barrett Burke and McCalla Raymer for the absence in the loan payment history of the December 13, 2006 payment made by the Debtor. [Aug. 8, 2007 Hr'g Tr. 144:21–145:3.] Smith also testified that "Countrywide's expectation would be that upon referral to counsel, that counsel would take all appropriate actions necessary to ensure the accuracy/validity of the documentation provided to the Court for a Motion for Relief." [Aug. 9, 2007 Hr'g Tr. 45:3–7.]

The Court finds Countrywide's attitude to be less than commendable. Countrywide is the client, and Countrywide has the records and documents necessary to substantiate and update the accuracy of any motion for relief from stay or proof of claim prepared by outside counsel. Smith's testimony leaves no doubt that Countrywide does not want to devote any employee time to reviewing the pleadings drafted by its own counsel.[25] This approach may well work in many cases, but it surely did not work in the case at bar. Countrywide's policy of not checking its counsels' work may well save money; no employee time need be allocated to reviewing outside counsels' work. However, the substantial attorneys' fees and expenses incurred by Countrywide in the case at bar, plus the amount of employee time spent preparing for and attending the show cause hearings, underscores the risks of taking this approach.

### 7. Policy changes made by the parties as a result of the show cause hearing

More than nine months passed between the issuance of the First Show Cause Order and the closing arguments in this matter. During this time, each of the parties attempted to respond to the issues raised by the Court and the UST. Although a multitude of issues remain unresolved, the Court is pleased that some steps have

---

**24.** The transcript from the March 5, 2007 hearing became available on March 7, 2007 so Ortiz had at least five months to review the transcript and inform this Court of her inaccurate testimony. There is no question that Ortiz reviewed the transcript of the March 5, 2007 hearing before she took the stand on August 10, 2007 [Aug. 10, 2007 Hr'g Tr. 105:16–18.]

**25.** Smith also conceded that Countrywide does not review its proofs of claim before its counsel files them. [Aug. 9, 2007 Hr'g Tr. 278:21–24.]

been taken in the right direction. After the parties read this Memorandum Opinion, the Court hopes they will continue these improvements.

### a. Changes made by Barrett Burke

Daffin testified that in the wake of this Court's issuance of the First Show Cause Order and the Second Show Cause Order, Barrett Burke no longer accepts referrals from other firms where Barrett Burke is not allowed to communicate directly with the client (i.e., the lender or the servicer). [July 27, 2007 Hr'g Tr. 252:4–253:12.] Daffin further testified that Barrett Burke will no longer file a motion to lift stay without attaching an affidavit from the servicer or lender attesting to the accuracy and current status of the loan that is the subject of the motion. [July 27, 2007 Hr'g Tr. 253:13–255:14.] She noted that Barrett Burke will insist upon an affidavit from the servicer or lender despite the difficulty in obtaining a loan history from inception. [July 27, 2007 Hr'g Tr. 258:14–21.]

### b. Changes made by McCalla Raymer

Thomas testified that, in order to assuage this Court's concerns about inaccurate loan histories in motions to lift stay and proofs of claim, McCalla Raymer now requires the servicer or lender to sign an affidavit swearing that the figures are correct before referring the file to local counsel. [Aug. 7, 2007 Hr'g Tr. 47:6–24.] Additionally, McCalla Raymer has altered the

language in its engagement letters so that local counsel is no longer prohibited from directly contacting the client so long as local counsel notifies McCalla Raymer about the direct communication. [Aug. 7, 2007 Hr'g Tr. 40:8–16.] Finally, Thomas testified that McCalla Raymer has instituted is that it will no longer make referrals to Barrett Burke, but rather to a different firm in Texas.[26] [Aug. 7, 2007 Hr'g Tr. 48:6–13.]

### c. Changes made by Countrywide

Countrywide has made two changes as a result of the Show Cause Orders.[27] First, Countrywide no longer refers Fannie Mae loans to a single national counsel. [Aug. 8, 2007 Hr'g Tr. 157:10–21.] Insofar as this change means that Countrywide will be directly communicating with attorneys who file pleadings on behalf of Countrywide, the Court believes that this is a positive change. Second, Countrywide will require that internal affidavits be executed prior to the filing of a motion to lift stay, and will be diligent about communicating with outside counsel to ensure that Countrywide provides accurate information. [Aug. 8, 2007 Hr'g Tr. 158:25–159:7.]

### F. Closing arguments raised at the December 12, 2007 hearing

#### 1. *Sua sponte* action is permissible.

The parties, led by counsel for Barrett Burke, took the position during closing arguments that the Court lacked the power to issue the Show Cause Orders because it acted on its own volition rather

---

**26.** It should be noted that Barrett Burke expressly informed McCalla Raymer that Barrett Burke no longer wished to received referrals from McCalla Raymer. [Aug. 7, 2007 Hr'g Tr. 48:15–23.]

**27.** Another change that Countrywide claimed to have made as a result of the Show Cause

Orders was committing to writing a policy stating that it would not charge borrowers for fees associated with a motion to lift stay that is withdrawn due to Countrywide's errors. The Court has already discussed its skepticism about this alleged written policy *supra* in section IV.D.

than on a pleading from the Debtor. In fact, the Debtor has never been involved in this matter as a complainant. In its post-trial brief, Barrett Burke described this proceeding as "nothing more than an expensive and exhaustive 'fact finding mission.'" [Docket No. 232, ¶ 45.]

Section 105(a) plainly states that the Court may act *sua sponte:*

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, **sua sponte,** taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a) (emphasis added).

The language from § 105(a) leaves no doubt that regardless of whether any party, including a debtor, complains about the actions of another, a bankruptcy court, on its own, may raise any issue and take any action to protect the integrity of the bankruptcy process. In the case at bar, this Court issued the First Show Cause Order only after providing counsel for Countrywide ample opportunity to explain why Countrywide wanted to withdraw the Motion. The Court could not reconcile the contradiction between the Debtor's written response with Thurmond's statement that

the Motion was "a good motion;" and Thurmond never filed any pleading reporting back to the Court with any information that would help this Court reconcile the contradiction. The Court therefore issued the First Show Cause Order to ensure that Countrywide and Barrett Burke were not abusing the bankruptcy process. The absence of any challenge by the Debtor or any other party-in-interest does not absolve this Court from its duty to ensure the integrity of the process.

In the case at bar, a major reason the Motion was riddled with errors was due to McCalla Raymer's "simplification" of Countrywide's payment history. While the Court would prefer not to have to invoke § 105(a) and instead have debtors' attorneys lodge objections to ill-founded proofs of claim and motions to lift stay, in actual practice serious and thorough challenges are rarely mounted. The absence of such challenges argues in favor of this Court and the UST becoming more—not less—involved in scrutinizing payment histories and conduct of mortgagees to avoid abuse of the bankruptcy system becoming accepted practice.[28] Indeed, in the case at bar, once this Court probed, and the UST became involved, it was established that Countrywide's Proof of Claim had to be amended not only once, but twice, which prevented the Debtor from being overcharged by $1,025.36.[29] This is a substantial sum to any debtor. Although

---

**28.** In addition to the UST, the bankruptcy process would be well served if Chapter 13 Trustees could devote the necessary time to review and, where applicable, lodge objections to improper or incomplete proofs of claim. As a practical matter, however, given the vast number of cases and limited resources of the Chapter 13 Trustees in the Southern District of Texas, it would be very difficult for the two Chapter 13 Trustees in Houston to undertake these tasks.

**29.** Countrywide's initial Proof of Claim set forth that total arrearages were $4,714.85.

[Proof of Claim No. 5–1.] As discussed herein, Countrywide, through McCalla Raymer, then filed a First Amended Proof of Claim setting forth that the total arrearages were $4,584.85—in other words, $130 less than the amount set forth in the Original Proof of Claim. [Proof of Claim No. 5–2.] Then, as further discussed herein, Countrywide filed a Second Amended Proof of Claim setting forth that the total arrearages are $3,689.49—in other words $895.36 less than the amount set forth in the First Amended Proof of Claim and $1,025.36 less than the amount set forth in

$1,025.36 maybe insubstantial to Countrywide, when that amount is multiplied by the tens of thousands of bankruptcy cases in which it has filed proofs of claim, the aggregate sum might total several million dollars of improperly obtained funds.

### 2. The Show Cause Orders are not moot.

■ Barrett Burke argues that the Show Cause Orders are moot because it has reimbursed the Debtor for the $250 of attorney's fees that he incurred in responding to the Motion. The Fifth Circuit has described the doctrine of mootness as applying when "(1) there is no reasonable expectation that the alleged violation will recur; and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Tex. Office of Pub. Util. Counsel v. F.C.C.*, 183 F.3d 393, 413–14 (5th Cir.1999) (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)).

■ That the Debtor is not a complainant has no bearing on this Court's jurisdiction or authority to issue show cause orders under 11 U.S.C. § 105. The Court's initial concern was about whether the Motion contained factual inaccuracies, but, after the March 5, 2007 hearing, new concerns developed about the defective system by which Countrywide, McCalla Raymer, and Barrett Burke file motions to lift stay and proofs of claim. Based on the testimony and exhibits described here-

in, the Court has reason to believe that the parties, in the future, might repeat the errors and misrepresentations that occurred in the case at bar. Accordingly, the Show Cause Orders are not moot.

### 3. The Frequency of Mistakes in Contested Matters in the Consumer Bankruptcy Practice

Barrett Burke's counsel also argued that this Court should not impose sanctions because the conduct called into question by this Court's Show Cause Orders an isolated incident of human error that is not commonplace. "Your Honor, the other observation that I would make is that if, in fact, the system is so egregious and so inadequate and so imperfect and so, fraught with errors, wouldn't we see it everywhere? Wouldn't we see the mistakes in every case, in every court, in every jurisdiction? And yet, we don't." [Dec. 12,2007 Hr'g Tr. 149:13–17.] This Court begs to differ, both as to the consumer practice in general and Barrett Burke in particular.

Less than a year ago, the Honorable Wesley W. Steen, Chief Bankruptcy Judge for the Southern District of Texas, imposed sanctions of $150,000.00 against Barrett Burke as a result of its committing numerous mistakes related to a motion to lift in a Chapter 13 case. *In re Allen*, 2007 WL 1747018, 2007 Bankr.LEXIS 2063 (Bankr.S.D. Tex. June 18, 2007).[30] Applying the factors set forth by the Fifth Circuit in *Topalian v. Ehrman*, 3 F.3d 931 (5th Cir.1993), Judge Steen noted that the

---

the Original Proof of Claim. [Proof of Claim No. 8.] In this Second Amended Proof of Claim, Countrywide did not claim the pre-petition attorney's fees and costs of $256.00, the post-petition fees and costs of $350.00, inspection fees of $46.00, and late charges of $243.36. But for the UST's thorough probing in the discovery associated with the show cause hearings, the erroneous, overstated arrearage amount in the Original Proof of

Claim and the First Amended Proof of Claim would never have been uncovered.

**30.** This amount was remitted in half "because Barrett Burke recognizes the gravity of its actions and takes responsibility for those actions" and Barrett Burke had taken actions to correct its deficiencies. *Allen*, 2007 WL 1747018, at *14, 2007 Bankr.LEXIS 2063, at *43. Such actions included implementing extra levels of document review and hiring for-

conduct of Barrett Burke sought to be deterred by the sanction was, among other things, "the filing of pleadings with the court that are clearly wrong (even contrary to the information in Barrett Burke's own files) or that otherwise are not thoughtful, considered, and intelligible." *Id.* at *1, 2007 Bankr.LEXIS 2063 at *6.

Thereafter, Judge Steen reviewed another factor from *Topalian:* what is the least severe sanction adequate to achieve the purpose of the rule under which it was imposed? He noted that answering this question requires review of several factors, including whether the improper conduct was part of a pattern of activity or an isolated event. *Id.* at *2, 2007 Bankr.LEXIS 2063 at *7. He then spent several pages discussing eight consumer cases in which Barrett Burke's conduct was woefully deficient. *Id.* at *2–8, 2007 Bankr.LEXIS at *9–25. In five of these instances, Barrett Burke filed motions to lift stay that contained inaccurate allegations about the debtors' payment defaults and/or failed to attach basic documentation such as the promissory note. *In re Thompson,* Case No. 01–10399, 2003 Bankr.LEXIS 2197 (Bankr.N.D.Tex.2003); *In re Smith,* Case No. 04–41212 (Bankr. S.D.Tex.2004); *In re Gaytan,* Case No. 04–50242 (Bankr.S.D.Tex.2005); *In re Clansy,* Case No. 04–40504 (Bankr. S.D.Tex.2005); *In re Cordova,* Case No. 04–50312 (Bankr.S.D.Tex.2005). A sixth case involved Barrett Burke filing an agreed order which was materially contrary to the terms negotiated by counsel for the debtor and the Barrett Burke attorney. *In re Davis,* Case No. 02–10389, 2003 Bankr.LEXIS 1583 (Bankr.N.D.Tex. 2003). A seventh case involved Barrett

Burke filing a proof of claim with no supporting documents. *In re Anderson,* 330 B.R. 180 (Bankr.S.D.Tex.2005).[31] The eighth case involved Barrett Burke submitting fee statements to the Court that, contrary to the testimony of the Barrett Burke attorney who sought to prove them up as business records, were actually non-contemporaneously-kept timesheets prepared in anticipation of litigation. *In re Porcheddu,* Case No. 05–40177, 338 B.R. 729 (Bankr.S.D.Tex.2006). After reviewing all of these error-laden examples, Judge Steen quite reasonably concluded that "the improper conduct [in *Allen*] was part of a pattern of activity and that Barrett Burke has been warned numerous times to correct its deficiencies." *Id.* at *2, 2007 Bankr.LEXIS at *9.

This Court is at a loss to understand how Barrett Burke's counsel—who, it should be noted, was also Barrett Burke's counsel in *Allen*—could suggest that the mistakes made in the case at bar are an isolated incident. As shown in *Allen,* Barrett Burke has repeatedly made the same kind of mistakes as those in the case at bar within the Southern District of Texas.

To the extent that the remarks of Barrett Burke's counsel were intended to suggest that the conduct in the case at bar has not been called into question in jurisdictions *outside* of the Southern District of Texas, the Court also disagrees. In addition to the two Northern District of Texas cases cited above, the Court would cite the following published opinions as examples of mistakes by firms other than Barrett Burke in jurisdictions outside of Texas that are similar to the errors in the case at bar:

mer Bankruptcy Judge Bill Brister as an independent auditor. *Id.* at *9, 2007 Bankr.LEXIS 2063 at *28.

**31.** Thurmond was the Barrett Burke attorney involved in *Anderson.* The Court, in denying

the mortgagee's motion to vacate an order sustaining the debtor's objection to proof of claim, noted that Thurmond was not as diligent as he should have been in representing the mortgagee. *Anderson,* 330 B.R. at 187.

(1) *In re Rivera,* 342 B.R. 435 (Bankr. D.N.J.2006).

The bankruptcy court issued a show cause order to the law firm of Shapiro and Diaz, LLP (S & D), a firm owned by two Illinois attorneys which represents mortgagees in consumer bankruptcies throughout the country. *Id.* at 439. The Court sanctioned S & D $125,000.00 for filing 250 motions to lift stay that contained presigned certifications of default executed by an individual who had not been an employee at S & D for over a year. *Id.* at 464. Characterizing S & D's use of presigned forms as "the blithe implementation of a renegade practice," the court noted that "S & D had become a paper-pushing factory" and that the firm's principals "seem to have lost sight of their professional responsibility. This loss was facilitated because [the principals] did not care to establish quality controls to assure that profession standards were being maintained." *Id.* at 464, 459, 466.

(2) *In re Ulmer,* 363 B.R. 777 (Bankr. D.S.C.2007).

The bankruptcy court issued a show cause order to the law firm of Butler and Hosch P.A. (B & H), a firm with offices in several states, including South Carolina and Florida, which represents mortgagees in consumer cases. *Id.* at 779. The court sanctioned B & H $33,500.00 for filing 67 motions to lift stay that: (1) contained defective affidavits and/or (2) were not reviewed and signed by the attorney whose name was on the motion. *Id.* at 785. The court noted that B & H's managing attorneys were not properly supervising the firm's associate attorneys. *Id.*

(3) *In re Osborne,* 375 B.R. 216 (Bankr. M.D.La.2007).

The bankruptcy court sanctioned Homeside Lending, its law firm, Shapiro and Mentz (S & M), and one associate attorney at S & M, Stacy Wheat (Wheat), jointly and severally, in the amount of $46,976.72, representing $41,976.72 in attorneys' fees and costs and $5,000.00 for the debtor's emotional distress. *Id.* at 229. The Court imposed the sanctions because Wheat, without any personal knowledge, signed an affidavit in support of relief from the stay declaring that the debtor had defaulted on her home loan to Homeside when, in fact, the debtor was not in default. *Id.* at 225. The bankruptcy court granted relief from the stay in reliance upon Wheat's submission of the affidavit, and foreclosure actions thereafter ensued, thereby causing the debtor emotional distress and substantial attorney's fees incurred to halt the foreclosure.

In his memorandum opinion, Bankruptcy Judge Douglas D. Dodd noted how S & M, which has a substantial practice representing mortgagees in real estate foreclosures and bankruptcies, allowed Wheat to handle its bankruptcy files:

Stacy Wheat handled Shapiro and Mentz's litigation and bankruptcy matters, including mortgage foreclosures. Wheat testified that an average of between 30 and 50 files crossed her desk every day. She relied on two or three employees to prepare the motions for relief from the automatic stay, select a hearing date, then file and serve the motions she had signed. Wheat testified that she had handled thousands of motions for Homeside between 1991 and 1999, but Homeside never asked to review draft pleadings or stay relief motions before she filed them. Instead, the evidence demonstrated that Wheat, as Homeside's lawyer, assumed that the information Homeside furnished her office was correct, and therefore that the

statements in documents that she filed on Homeside's behalf were accurate. *Id.* at 220.

The conduct in the case at bar is similar to certain conduct in *Rivera, Ulmer,* and *Osborne.* Here, for example, the testimony was clear that Countrywide never reviewed the motions to lift stay which Barrett Burke or McCalla Raymer filed on its behalf. No attorney at McCalla Raymer reviewed the work of the legal assistants who constructed the so-called simplified payment history which was then forwarded to Barrett Burke. There was also a lack of candor to the Court: Thurmond's statement that "it was a good motion" was as deceptive as S & D's filing of certifications signed by an individual who was no longer employed by that law firm. Here, as in the three cases cited above, the partners at Barrett Burke and McCalla Raymer have not sufficiently supervised their associates and established sufficient controls to assure that professional standards are maintained.

In sum, there are published opinions from New Jersey, South Carolina, and Louisiana evidencing substantial and material errors in motions to lift stay filed by law firms representing mortgagees in consumer bankruptcies in several states. Contrary to the suggestion of Barrett Burke's counsel, there are mistakes similar to the ones in the case at bar occurring in jurisdictions throughout the country.

## V. Actions to be taken by this Court as a result of the hearings on the Show Cause Orders

### A. The Show Cause Orders were issued pursuant to 11 U.S.C. § 105(a) and the Court's inherent power and were not in the nature of either civil or criminal contempt

The Court issued the First Show Cause Order under its inherent power "pursuant to *Chambers v. NASCO,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), and 11 U.S.C. § 105(a)." Section 105(a) states:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

In *Chambers,* the Supreme Court recognized that courts have an inherent power to issue sanctions against litigants for their bad-faith conduct. *Chambers,* 501 U.S. at 43–46, 111 S.Ct. 2123. Although *Chambers* involved a district court, the inherent powers described by the Supreme Court "are equally applicable to the bankruptcy court." *In re Case,* 937 F.2d 1014, 1023 (5th Cir.1991). The limits on a bankruptcy court's power to sanction under its inherent powers and § 105(a) are essentially coterminous. *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.),* 77 F.3d 278, 284 (9th Cir.1996) ("By providing that bankruptcy courts could issue orders necessary 'to prevent an abuse of process,' Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that *Chambers* recognized exists within Article III courts."); *In re Courtesy Inns, Ltd., Inc.,* 40 F.3d 1084, 1089 (10th Cir. 1994) ("We believe, and hold, that § 105 intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in *Chambers*").

It is undisputed that, within the Fifth Circuit, a bankruptcy court lacks

criminal contempt power. *Placid Ref. Co. v. Terrebonne Fuel & Lube (In re Terrebonne Fuel & Lube)*, 108 F.3d 609, 613 n. 3 (5th Cir.1997). Barrett Burke mistakenly argues that these proceedings have been in the nature of criminal contempt. Therefore, Barrett Burke argues that this Court lacked jurisdiction throughout the entire duration of these proceedings. This argument is based upon the incorrect assumption that the Show Cause Orders relied upon the Court's contempt power. Neither of the two Show Cause Orders ever mentions contempt nor do they seek to enforce any order of the Court. The power to issue the Show Cause Orders and conduct the hearings in this matter were solely derived from § 105(a) and the inherent power of the Court to regulate the parties before it. *See Chambers*, 501 U.S. at 46, 111 S.Ct. 2123 (noting that inherent powers can be used without resorting "to the more drastic sanctions available for contempt of court."). Thus, Barrett Burke's argument that the Court lacks jurisdiction is without merit.

In its post-hearing brief, Countrywide argued that: "The issues regarding Countrywide in this Show Cause Proceeding are governed by Rule 9011. Because the Motion was withdrawn before the Show Cause Order was entered, Countrywide cannot be monetarily sanctioned for filing the Motion." [Docket No. 231, p. 2.] Barrett Burke made a similar argument. [Docket No. 232, pp. 26–35.] This argument is apparently derived from the following language in *Chambers:* "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123.

■ The parties overlook the word "ordinarily" and extract a rule from these two sentences that the Court may not exercise its inherent power when a Rule exists that may arguably regulate the same conduct. This argument contradicts the ultimate holding in *Chambers.* Despite encouraging courts to utilize the Rules whenever possible, the Supreme Court held that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 49, 111 S.Ct. 2123. "There is, therefore, nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct. This is plainly the case where the conduct at issue is not covered by one of the other sanctioning provisions. But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123; *see also Link v. Wabash R. Co.*, 370 U.S. 626, 630–32, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). This Court may exercise its inherent power when the conduct sought to be regulated is "intertwined" with conduct that is sanctionable under the Rules. *Chambers*, 501 U.S. at 51, 111 S.Ct. 2123; *see also First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501 (6th Cir.2002).

■ In the case at bar, the Court's impetus to issue the First Show Cause Order was its suspicion that Thurmond had lied at the February 6, 2007 hearing. Such an oral misrepresentation would be outside the scope of Rule 9011, but would be within the Court's inherent power.

Many of the other issues raised by the Court are not directly covered by Rule 9011 or any other Rule: the prohibition against direct communication with the client; Countrywide improperly charging borrowers fees for withdrawn motions; and the process by which these parties prepare and deliver payment histories to the Court. Thus, the Court appropriately resorted to its inherent power to address the full range of conduct in the case at bar because this conduct exceeded the scope of Rule 9011.

**B. In order to impose sanctions under its inherent power, the Court must find clear and convincing evidence of conduct that is in bad faith, vexatious, wanton, or undertaken for oppressive reasons.**

 In order for the Court to impose sanctions pursuant to its inherent power or § 105(a), it must make "a specific finding of bad faith." *Goldin v. Bartholow,* 166 F.3d 710, 722 (5th Cir.1999); *Crowe v. Smith,* 261 F.3d 558, 563 (5th Cir.2001); *Bynum v. Am. Airlines, Inc.,* 166 Fed.Appx. 730, 735 (5th Cir.2006) (citing *Chambers,* 501 U.S. at 44–46, 111 S.Ct. 2123) ("One aspect of this inherent power is the power to impose sanctions, including attorney's fees, on litigants for conduct that is in bad faith, vexatious, wanton or undertaken for oppressive reasons."); *Matta v. May,* 118 F.3d 410, 416 (5th Cir.1997); *Matter of Volpert,* 110 F.3d 494, 500 (7th Cir.1997). "Bad faith, for the purposes of section 105 is characterized as an attempt to abuse the judicial process." *In re Gorshtein,* 285 B.R. 118, 124 (Bankr. S.D.N.Y.2002) (citing *In re Spectee Group, Inc.,* 185 B.R. 146, 155 (Bankr.S.D.N.Y. 1995)). Moreover, the threshold for im-

posing sanctions using the court's inherent powers is extremely high. The court should invoke its inherent powers if it finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled." *Chambers,* 501 U.S. at 46, 111 S.Ct. 2123.

 The Fifth Circuit has applied a clear and convincing evidence standard when the sanction imposed is attorney suspension or disbarment, but the Fifth Circuit has never directly stated the appropriate standard for less severe sanctions. *In re Cochener,* 360 B.R. 542, 572–73 (Bankr. S.D.Tex.2007) (citing *Crowe v. Smith,* 261 F.3d 558 (5th Cir.2001)). However, in the appeal of *Cochener,* District Judge Sim Lake ruled that the Fifth Circuit would apply a clear and convincing standard when the sanction is penal in nature.[32] In making this ruling, Judge Lake pointed to *Shepherd v. Am. Broadcasting Companies, Inc.,* 62 F.3d 1469 (D.C.Cir.1995) because the Fifth Circuit positively cited *Shepherd* in *Crowe. Barry v. Sommers (In re Cochener),* 382 B.R. 311, 328 (S.D.Tex.2007) (appeal taken but not yet docketed). *Shepherd* held that a preponderance of the evidence standard is applied when the sanction is issue-related, such as the exclusion of evidence, but the court must apply the clear and convincing standard if the sanction is penal in nature, such as the imposition of a fine or an award of attorney's fees. *Shepherd,* 62 F.3d at 1478. Any sanction that this Court may order as a result of the Show Cause Order would be punitive in nature and, therefore, the appropriate standard of proof in the case at bar is clear and convincing. In order to meet the clear and convincing standard, the evidence presented must be "so clear, direct and weighty and convinc-

---

**32.** Judge Lake's opinion was not issued until December 28, 2007, which was two weeks after the last hearing in the case at bar. Giv-

en this ruling, this Court will apply the clear and convincing standard in the case at bar.

ing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts." *In re Medrano*, 956 F.2d 101, 102 (5th Cir.1992) (citing *Cruzan v. Director Mo. Dept. of Health*, 497 U.S. 261, 285 n. 11, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)).

## C. Thurmond's knowing misrepresentation to this Court constitutes bad faith.

■ At the February 6, 2007 hearing, this Court asked Thurmond if the Motion contained allegations about the payment history that were "just flat-out wrong." [Feb. 6, 2007 Hr'g Tr. 4:2–7.] He responded that "it was a good motion." [Feb. 6, 2007 Hr'g Tr. 4:10.] There was an abundance of testimony during the show cause hearings to establish by clear and convincing evidence that Thurmond had actual knowledge of the inaccurate factual allegations in the Motion before appearing at the February 6, 2007 hearing. Thus, the Court concludes that Thurmond made an intentional and knowing misrepresentation to the Court.[33] This finding alone constitutes bad faith for purposes of imposing sanctions under the Court's inherent power.[34] *Hamm v. Hiler (In re Smyth)*, 242 B.R. 352, 361 (W.D.Tex.1999) (holding that an attorney's "unflinching lie to the bankruptcy court regarding when the property was transferred qualifies as a 'defiling of the very temple of justice.' ").

The Court concludes that there is clear and convincing evidence that Thurmond had actual knowledge of the inaccurate factual allegations in the Motion for the following reasons: (1) Thurmond admitted that he knew before attending court on February 6, 2007 that the November 9, 2005 and May 5, 2006 payments had been misapplied and the December 13, 2006 payment was not recorded. [Aug. 10, 2007 Hr'g Tr. (afternoon session) 46:16–47:21]; (2) Schlotter convincingly testified that Thurmond called him the day before the February 6, 2007 hearing seeking permission to withdraw the Motion because of its erroneous allegations about the Debtor's defaults. [Aug. 8, 2007 Hr'g Tr. 70:2–71:11]; (3) Thurmond read the Barrett Burke attorney worksheet prior to attending the February 6, 2007 hearing. The attorney worksheet stated that "These payments have now been applied correctly and we have found that the loan was post petition due for 12/01/2006 with money in suspense when we filed the [Motion] on 12/29/2006 and this is why we are withdrawing the [Motion]." [Barrett Burke Ex. No. 31.]; and (4) Thurmond spoke with Knesek just prior to the February 6, 2007 hearing about the need to withdraw the Motion, and the bankruptcy case comments of Barrett Burke reflect that Kne-

---

**33.** As noted previously, Thurmond also misled the Court by informing it that he would go back to his office to investigate the allegations about the payment history. Thurmond had no intention to conduct an actual investigation and report back to the Court. Instead, he believed that this statement would satisfy the Court's interest in the Motion and the issue would simply go away.

**34.** It should be noted that Thurmond is an attorney and, as such, this Court may impose a heightened standard of conduct on him when considering sanctions. *Carroll v. Jaques Admiralty Law Firm, P.C.* 110 F.3d 290,

293–94 (5th Cir.1997). Additionally, Thurmond testified that he has four degrees: a bachelor's degree from Baylor University, a master's degree in accounting from the University of Houston, a Juris Doctor from South Texas College of Law, and an LLM in taxation from Southern Methodist University. [July 27, 2007 Hr'g Tr. 342:17–24.] Thus, Thurmond had more degrees than any other individual in the courtroom. He can hardly claim to be unsophisticated or, for that matter, given his 24 years of practicing law, inexperienced.

sek knew that the Motion contained factually inaccurate allegations. [Barrett Burke Exhibit No. 3, pg. 2; Aug. 10 Hr'g Tr. (afternoon session) 34:2–35:13.] Because Thurmond had actual knowledge of the inaccurate allegations in the Motion, the Court concludes that his statement that the Motion was "a good motion" was a knowing misrepresentation made in bad faith.

### D. The Court will issue no sanctions against Thurmond despite its specific finding of bad faith and his past misbehavior.

The case at bar is not the first time Thurmond has engaged in bad faith conduct in the Southern District of Texas. *See In re Porcheddu*, 338 B.R. 729 (Bankr.S.D.Tex.2006). In *Porcheddu*, Bankruptcy Judge Marvin Isgur, after issuing a show cause order, imposed sanctions against Barrett Burke and one of its attorneys, R.J. Bryant, for intentionally and dishonestly submitting fee statements that were not kept contemporaneously as required by applicable Fifth Circuit case law. Indeed, part of the dishonest conduct involved misleading or downright false testimony and representations made by Thurmond. Set forth below is how Judge Isgur characterized Thurmond's statements:

> In closing arguments, Barrett Burke took solace in Mr. Thurmond's carefully chosen words on October 7, 2004. His statement was only that the task records were contemporaneous, not that the corresponding time entries were contemporaneous. Notably, he did not affirmatively advise the Court that the fee

statement's time entries were made after-the-fact. Thurmond described the fee statement as a "summary" of Barrett Burke's records; it was not a summary. The fee statement included the task entries (which were contemporaneous and were summarized from the firm's records) but also included time entries that had not previously existed at all. It is not possible to create a summary from non-existent records. The inclusion of new information—not captured in Barrett Burke's records—makes the document something other than a summary. Instead, it is a document prepared for the purposes of litigation. In this case, it was a document prepared for litigation for the purpose of avoiding the hearsay rule. *Far from meeting a duty of candor to the Court, Thurmond's October 7, 2004 statement appears to have been intended to misdirect the Court. That sleight of hand was carried forward for a year and culminated in Bryant's false testimony on October 21, 2005.*

*Porcheddu*, 338 B.R. at 733 (emphasis added).

Judge Isgur's description of Thurmond's conduct is identical to his conduct in the case at bar. Just as he deliberately failed to make complete disclosures of the facts regarding Barrett Burke's timesheets to Judge Isgur, Thurmond intentionally refused to make full disclosure concerning the accuracy of the Motion's allegations to the undersigned judge. Thurmond attempted to misdirect Judge Isgur by not affirmatively advising him that Barrett Burke's time entries were created after-the-fact.[35] Similarly, Thurmond attempted

---

**35.** The Court notes that Judge Isgur did not impose sanctions against Thurmond, but only against Bryant and Barrett Burke. The reason that he did not do so is that when he issued his show cause order, he named only

Bryant and Barrett Burke as the subjects of the order—no doubt due to his belief at the time of the issuance of the order that Bryant was the only attorney whose conduct needed to be scrutinized. The language in Judge

to mislead the undersigned judge by advising him that the Motion was "good," which did not answer the actual question posed by the Court.

 However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123. "The court must impose the least onerous sanction that addresses the situation." *In re Hughes*, 360 B.R. 202, 209 (Bankr. N.D.Tex.2007). Thurmond testified that Barrett Burke fired him with prejudice in March 2007.[36] [Aug. 10, 2007 Hr'g Tr. (afternoon session) 66:4–22.] Being fired with prejudice can have serious repercussions on an individual's professional career. Indeed, at the time he gave testimony in this Court, Thurmond was still seeking permanent employment elsewhere. Given these circumstances, the Court believes that no sanctions should be imposed against Thurmond.

### E. Thurmond's bad faith conduct is imputed to Barrett Burke.

 On February 6, 2007, Thurmond was employed as an associate attorney at Barrett Burke. Accordingly, Thurmond's bad faith conduct is imputed to Barrett Burke. *See Religious Tech. Or. v. Liebreich*, 98 Fed.Appx. 979, 988 n. 30 (5th Cir.2004) (imposing sanctions under 28 U.S.C. § 1927 jointly and severally against attorneys and their law firm); *Worrell v. GreatSchools, Inc.*, 2007 WL 4223234 at *3, 2007 U.S. Dist. LEXIS 87344 at *10 (S.D.Tex. November 28, 2007) (imposing sanctions under Rule 11 jointly and severally against attorney and his firm); *see also Jordaan v. Hall*, 275 F.Supp.2d 778, 790–91 (N.D.Tex.2003). That Thurmond's conduct is imputed to Barrett Burke is not only correct as a matter of law, but it also entirely appropriate as a matter of imposing responsibility on Barrett Burke's partners for hiring Thurmond and then keeping him on the payroll. The partners at Barrett Burke are charged with knowing about Thurmond's inappropriate conduct as articulated by Judge Isgur in *Porcheddu*. Moreover, the partners are charged with knowing about Thurmond's ill-preparedness as articulated by the undersigned judge in *Anderson*, 330 B.R. at 187. The Court hopes that the partners are Barrett Burke stay more abreast of their associates' actions in the future.

### F. This Court will issue no sanctions against Barrett Burke despite Thurmond's bad faith conduct being imputed to it.

 Although Thurmond's bad faith misrepresentations can, as a matter of law, be imputed to Barrett Burke, the Court will impose no sanctions on the firm in light of certain corrective actions that the

Isgur's written opinion about Thurmond's conduct leaves little doubt that if Thurmond's name had been set forth in the show cause order, Judge Isgur would have imposed sanctions against him. Indeed, Judge Isgur wrote that "Although the Court's analysis of the sanctions identifies other persons employed by Barrett Burke, only Bryant and Barrett Burke were the subjects of this Court's show cause order. Accordingly, the Court has not considered sanctions against any other person." *Porcheddu*, 338 B.R. at 732. In short, Judge Isgur was properly concerned about lack of due process to Thurmond and there-

fore did not impose sanctions against him. In the case at bar, this Court has no such due process concerns, as both the First Show Cause Order and the Second Show Cause Order put Thurmond on notice that it was scrutinizing his conduct. Moreover, Thurmond was represented by competent counsel in the case at bar.

**36.** Unlike Sanov, who was fired because of her conduct in *Allen*, Thurmond did not state what the precipitating event was that led to his firing.

firm has taken, including: (1) changing the firm's policy to accept referrals only if Barrett Burke attorneys may communicate directly with the client; (2) requiring an affidavit from the servicer or lender to be attached to any motion to lift stay that the firm files; and (3) taking appropriate action against employees—in this case, Thurmond—whose conduct falls short of meeting the appropriate standards in the legal profession.

**G. The Court cannot find by clear and convincing evidence that the conduct of Barrett Burke (except for the imputation of Thurmond's conduct), McCalla Raymer, or Countrywide reached the level of bad faith and, therefore, the Court will not issue sanctions again these parties.**

 While the Court is very disheartened by the conduct of Barrett Burke, McCalla Raymer, and Countrywide in this case, and also the manner in which they have structured their attorney-client relationship, it is unable to say that their conduct transcended from merely negligent bungling to full-blown bad faith. A decision not to sanction Barrett Burke, McCalla Raymer, or Countrywide, however, does not imply that their conduct was appropriate. The Court cannot emphasize enough that it does not condone the conduct of Barrett Burke, McCalla Raymer, and Countrywide described in this Memorandum Opinion.

## VI. Conclusion

Over the past several years, attorney's fees and costs have risen steadily—some clients would doubtless say astronomically.

Corporations in particular have reacted by demanding concessions such as flat fee pricing for each file. In the consumer bankruptcy field, many financial institutions—for example, Fannie Mae in the case at bar—have negotiated flat fee engagements with certain law firms to avoid large fees that can accrue under an hourly rate system. In theory, this arrangement seems appropriate: fixed fees minimize costs that are primarily passed on to consumer debtors. In practice, this arrangement has fostered a corrosive "assembly line" culture of practicing law.

As the case at bar shows, attorneys and legal assistants at Barrett Burke and McCalla Raymer are filing motions to lift stay without questioning the accuracy of the debt figures and other allegations in these pleadings and appearing in court without properly preparing for the hearings. These lawyers appear in court with little or no knowledge because they have been poorly trained. Indeed, the case at bar shows that the attorneys from Barrett Burke and McCalla Raymer often appear in court ill-prepared to think or effectively communicate.

This fixed-fee business model appears to have been an overwhelming financial success. In *Allen*, Bankruptcy Judge Steen noted that Barrett Burke's revenues totaled between approximately $9.7 million and $11.6 million per annum. *Allen*, 2007 WL 1747018 at *13–14, 2007 Bankr.LEXIS 2063 at *42. Based upon the testimony at the show cause hearings, this Court estimates that McCalla Raymer has generated revenues of approximately $28 million over the past decade from representing solely Fannie Mae.[37] Meanwhile, the profession

---

**37.** Thomas testified that McCalla Raymer made approximately 140,000 referrals under the Fannie Mae program (which included Countrywide, among other servicers) over the past ten years. [Aug. 7, 2007 Hr'g Tr. 43:5–11.] When one multiplies 140,000 times $200 (i.e. the net amount received by McCalla Raymer), the result is $28 million—substan-

has suffered from the ever decreasing standards that firms like Barrett Burke and McCalla Raymer have heretofore promoted.

This demise must stop. The problems at Barrett Burke and McCalla Raymer are not limited to training lawyers; there are other aspects of these firms' culture that is disconcerting. What kind of culture condones a firm signing an engagement letter which prevents its attorneys from communicating with its client? What kind of culture condones its lawyers preparing, signing, and filing motions to lift stay without having the client review the final version for accuracy? What kind of culture condones its attorneys signing proofs of claims without even contacting the client to review and confirm the debt figures? What kind of culture condones attorneys testifying to basic facts and then, at the next hearing, recanting the testimony on the grounds that the attorney had not sufficiently prepared to testify? And above all else, what kind of culture condones its lawyers lying to the court and then retreating to the office hoping that the Court will forget about the whole matter?

Countrywide's corporate culture is no better. What kind of culture condones blockading personnel from communicating with outside counsel? What kind of culture discourages the checking of outside counsel's work? What kind of culture promotes payment histories that are so confusing to the vast majority of persons, including attorneys and judges—not to mention borrowers—that it becomes necessary for legal assistants to "simplify" them—leading to more errors and confusion?

Barrett Burke and McCalla Raymer complain that this Court expects perfection from the attorneys who appear in this Court. While perfection is too much to demand, preparedness and candor are not. The vast majority of attorneys who appear in this Court easily meet these standards. There is no reason why the attorneys from Barrett Burke and McCalla Raymer cannot do the same.

With respect to Countrywide, this Court would hope that this entity would reevaluate its policies and procedures in order to improve upon the accuracy of payment histories and to ensure that its actions do not undermine the integrity of the bankruptcy system. Countrywide's business is directly tied to a quintessentially American aspiration—homeownership. If Countrywide does not properly maintain payment histories and effectively communicate with its counsel, the consequences can be very harmful. As Professor Porter has noted: "Mortgage servicing abuse weakens families' efforts to manage their mortgages successfully and can result in families being wrongfully deprived of their homes through foreclosure or unsuccessful outcomes in bankruptcy. Mortgagees' failure to honor the terms of their loans and applicable law weakens America's homeownership policies and threatens families' financial well-being." Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, U. of Iowa Legal Studies Research Paper No. 07–29, Nov. 6, 2007, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id= 1027961.

This Court trusts that Barrett Burke, McCalla Raymer, and Countrywide will mend their broken practices. The Court

---

tial revenues, particularly for a firm with relatively few partners. Aside from Thomas' testimony, Smith testified that McCalla Raymer's revenues from all Countrywide refer-
rals (as opposed to just Fannie Mae files) on an annual basis total approximately $10,440,000.00. [Aug. 9, 2007 Hr'g Tr. 261:19–24.]

will continue to verify that its trust is well-placed.

## *ADDENDUM*

| Name [1] | Description | Dates testified |
|---|---|---|
| Mary Daffin | Barrett Burke partner in charge of the bankruptcy department. Described her job as primarily "client maintenance" and stated that she had very little involvement in the drafting, filing, and prosecuting of motions to lift stay. Testified as Barrett Burke's corporate representative. | July 27; Aug. 10 |
| Yvonne Knesek | Barrett Burke associate who appeared at the January 23, 2007 preliminary hearing on the Motion. | Did not testify |
| Lois Ortiz | Countrywide employee who manages the bankruptcy department. | Mar. 5; Aug. 10 |
| LaToya President | Paralegal at M.R. Default Services, formerly employed by McCalla Raymer prior to the spinning off of M.R. Default Services. Processed the Countrywide payment history into the "simplified" and mistake-ridden version which was sent to Barrett Burke. | Aug. 8 |
| Christopher Reilly | Former Barrett Burke associate who received the referral of the Debtor's file from McCalla Raymer and was responsible for all files referred from McCalla Raymer. | July 27 |
| Felicia Sanov | Former Barrett Burke associate who signed and submitted the Motion. | Mar. 5; July 27; Aug. 10 |
| John Schlotter | McCalla Raymer associate who referred the Debtor's file to Barrett Burke. | Mar. 5; Aug. 8; Aug. 9 |
| John Smith | Countrywide's first vice-president of foreclosure and bankruptcy. Appeared as Countrywide's corporate representative. | Aug. 8; Aug. 9 |
| Regina Thomas | McCalla Raymer associate who manages ten attorneys in the firm's bankruptcy department. Previously, Thomas spent 12 years as the Chapter 13 Trustee for the Northern District of Georgia. | Aug. 7; Aug. 9 |
| Walter Thurmond | Former Barrett Burke associate who appeared at the final hearing on February 6, 2007 to withdraw the Motion. | July 27; Aug. 10 |

1. Set forth above are the names of the witnesses to whom this Court refers in its Memorandum Opinion. Several other witnesses also testified, but their names are not referenced in the Memorandum Opinion and therefore they are not identified in this addendum.